# 12-4803-bk

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

— v. —

EDWARD P. BOND, Liquidating Trustee of the
Liquidating Trust U/A/W PT1 Communications, Inc.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

LAURENCE MAY
THERESE SCHEUER
COLE, SCHOTZ, MEISEL, FORMAN
  & LEONARD, P.A.
*Attorneys for Defendant-Appellant*
900 Third Avenue, 16th Floor
New York, New York 10022
(212) 752-8000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION, JURISDICTIONAL STATEMENT AND STANDARD
OF REVIEW ............................................................................................1

STATEMENT OF ISSUE ON APPEAL...................................................6

STATEMENT OF THE CASE AND FACTS ...........................................7

SUMMARY OF THE ARGUMENT .....................................................21

ARGUMENT ..........................................................................................25

    POINT I. THE DISTRICT COURT ERRED WHEN IT HELD THAT PT-
    1'S CONFIRMED PLAN OF REORGANIZATION DID NOT BAR THE
    IRS FROM ASSERTING A PRE-CONFIRMATION SETOFF CLAIM
    OR A PRE-CONFIRMATION RECOUPMENT DEFENSE ............................25

    POINT II. THE IRS'S CLAIM THAT IT CAN EXERCISE A RIGHT OF
    SETOFF OR RECOUPMENT AS TO THE ALLEGED
    UNDERPAYMENT OF TAXES ARISING OUT OF THE IDT
    TRANSACTION IS BARRED BY RES JUDICATA .........................................31

    POINT III. THE IRS WAIVED IMMUNITY AND THE BANKRUPTCY
    COURT HAD JURISDICTION TO ADJUDICATE ITS PRE-
    CONFIRMATION SETOFF CLAIMS ...............................................................35

    POINT IV. THE IRS CLAIMS FOR TAXES ARISING OUT OF THE
    IDT TRANSACTION DO NOT FALL WITHIN THE RECOUPMENT
    DOCTRINE...........................................................................................38

CONCLUSION .......................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Anes v. Dehart (In re Anes),195 F.3d 177, 182 (3d Cir. 1999) ...............................39

In re Arch Wireless, 332 B.R. 241 (Bank. D. Mass. 2005) ....................................27

Babitt v. Vibeliunas (In re Vibeliunas), 332 F.3d 85, 90 (2d Cir. 2003)..................6

Central Virginia Community College v. Katz, 546 U.S. 356, 126 S. Ct. 990 (2006).....................................................................................................23, 30

Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.), 82 F.3d 956, 959 (10th Cir. 1996) ...........................................................................................39

Davidovich v. Welton (In re Davidovich), 901 F.2d 1533, 1538 (10th Cir. 1990) ..........................................................................................................39

Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S. Ct. 2424 (1981) ...........................................................................................................31

First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough, L.L.P. (In re Varat Enters., Inc.), 81 F. 3d 1310, 1315 (4th Cir. 1996)..............25

Gardner v. NJ, 329 U.S. 565, 67 S. Ct. 467 (1947) ...................................................29

Lee v. Schweiker, 739 F.2d 870 (3rd Cir. 1984) ......................................................39

Malinowski v. New York State Department of Labor (In re Malinowski), 156 F.3d 131 (2d Cir. 1998) ..............................................................................38

Presidential Gardens Assocs. v. United States ex. rel. Sec. of Housing and Urban Dev., 175 F.3d 132, 142 (2d Cir. 1999)...................................................26

R.L. Wright v. Centennial Health Care Corp., 383 B.R. 355, 357 (D.D.C. 2008) ..........................................................................................................27

Republic Supply Co. v. Shoaf, 815 F. 2d 1046, 1050-54 (5th Cir. 1987)...............25

Silverman v. Tracar, S.A. (In re Am Preferred Prescription, Inc.), 255 F. 3d 87, 92 (2d Cir. 2001)..........................................................................................25

In re University Medical Center, 973 F.3d 1065,1080 (3d Cir 1992) ....................38

In re Space Bldg. Corp., 206 B.R. 269 (D. Mass. 1996) .........................................27

St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000) ...............................................31

Stoll v. Gottlieb, 305 U.S. 165, 170-71, 59 S. Ct. 134, 136-37 (1938) ..................25

Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.), 468 B.R. 603,
    615 (S.D.N.Y. 2012) ..........................................................................................27

Tennessee Students Assistance Corporation v. Hood, 541 U.S. 440, 124 S.
    Ct. 1905 (2004) ......................................................................................23, 29, 30

Travelers Indem. Co. v. Bailey, 557 U.S. 137, 153-54, 129 S. Ct. 2195,
    2206-07 (2009)....................................................................................................25

United States of America v. Bond
    486 B.R. 9, 45 (E.D.N.Y. 2012) .......................... 3, 11, 14, 17, 18, 19, 20, 21, 37

United States v. Carolina Parachute Corp., 907 F.2d 1469, 1473 (4th Cir.
    1990) ...................................................................................................................25

Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1080 (3rd
    Cir. 1992) ............................................................................................................38

Westinghouse Credit Corporation v. D'Urso, 278 F.3d 138 (2d Cir. 2002) ...........38

**STATUTES**

11 U.S.C. § 101(5) ...................................................................................................27

11 U.S.C. § 101(10) .................................................................................................18

11 U.S.C. § 101(12) .................................................................................................27

11 U.S.C. § 106 ........................................................................................................26

11 U.S.C. § 503(b)(1)(B) .........................................................................................28

11 U.S.C. § 1141(d) ...................................................................................5, 18, 22, 27

28 U.S.C. § 1291 ........................................................................................................6

Anti-Injunction Act, 26 U.S.C. § 7421 ....................................................................9

§ 106(a)(1) and (2) of the Bankruptcy Code........................................................5, 22

§ 106(b) of the Bankruptcy Code...............................................................35, 36, 37

§§ 503 and 505 of the Bankruptcy Code ............................................................5, 28

§ 505(b) of the Bankruptcy Code.......................................................................9, 18

§ 1141 of the Bankruptcy Code .......................................................5, 17, 22, 26, 30

section of the Bankruptcy Code ...............................................................................17

**RULES**

Rule 9014 of the Federal Rules of Bankruptcy Procedure .......................................8

Rule 62.1 of the Federal Rules of Civil Procedure ..................................................4

Rule 9014(d) ............................................................................................................8

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

----------------------------------------------------------x

UNITED STATES OF AMERICA,

               Plaintiff-Appellee,

             v.

EDWARD P. BOND, LIQUIDATING TRUSTEE
OF THE LIQUIDATING TRUST U/A/W PT-1
COMMUNICATIONS, INC,

               Defendant-Appellant.

----------------------------------------------------------x

Docket No. 12-4803

## INTRODUCTION, JURISDICTIONAL STATEMENT
## AND STANDARD OF REVIEW

This brief is submitted by Appellant Edward P. Bond ("Appellant" or

"Trustee"), Trustee of the Liquidating Trust (the "Liquidating Trust" or the

"Trust") of PT-1 Communications, Inc., et al. from so much of a final

Memorandum Decision and Order (the "Memorandum Decision") of the United

States District Court for the Eastern District of New York, Hon. Brian M. Cogan,

D.J. (the "District Court") dated September 15, 2012, as corrected on September

17, 2012, which reversed one aspect of a decision of the United States Bankruptcy

Court for the Eastern District of New York (Hon. Carla E. Craig, Chief Judge). (SPA 1).[1]

The District Court's Memorandum Decision generally affirmed the legal rulings and factual findings of the Bankruptcy Court as set forth in four separate reported decisions.[2]  In these rulings, the last of which followed a multi-day trial, the Bankruptcy Court (i) expunged a series of four proofs of claim filed by the Internal Revenue Service (the "IRS" or the "Government") against PT-1 Communications, Inc., PT-1 Long Distance, Inc. and PT-1 Technologies, Inc. (collectively "PT-1") for pre-petition and post-petition taxes, penalties and interest and (ii) awarded Appellant, as the successor to PT-1's right to receive tax refunds, refunds for the tax period ending on June 30, 1998 (the "6/30/98 Period" and the "6/30/98 Refund") and for the period March 9, 2001 through December 31, 2001 (the "2001 Short Period" or the "Short Period" and the "2001 Refund").  With accrued interest, these refunds now total approximately $8.7 million.

---

[1]  "A" followed by a number is a reference to the relevant page in the Joint Appendix filed in connection with the appeal; "SPA" followed by a number is a reference to the relevant page in the Special Appendix filed in connection with the appeal.

[2]  The four decisions, all of which are titled In re PT-1 Communications, Inc. are reported at 357 B.R. 217 (Bankr. E.D.N.Y. 2006) ("Decision I") (A 17 et seq.), 386 B.R. 402 (Bankr. E.D.N.Y. 2007) ("Decision II") (A 24 et seq.), 403 B.R. 250 (E.D.N.Y. 2009) ("Decision III") (A 33 et seq.) and 447 B.R. 115 (Bankr. E.D.N.Y. 2011) ("Decision IV") (A 494 et seq.).

2

On November 15, 2012, the Government filed a timely notice of appeal from the Memorandum Decision and on November 30, 2012 the Trustee timely filed a cross-appeal from so much of the Memorandum Decision which vacated "[t]hat part of the [Bankruptcy Court] order enjoining the IRS from exercising any future right of setoff or recoupment."  <u>United States of America v. Bond</u>, 486 B.R. 9, 45 (E.D.N.Y. 2012). (SPA 39).  In March of this year, the Government moved to withdraw its appeal and by order dated March 25, 2013, the Court of Appeals granted the motion and dismissed the Government's appeal with prejudice.

With the withdrawal of its appeal, the Trustee thought that his nearly decade long effort to obtain tax refunds for PT-1's creditors, awarded to him by the Bankruptcy Court and affirmed by the District Court was at an end; were that so this appeal would not be necessary.  Indeed, even though the Memorandum Decision reversed the Bankruptcy Court to the extent of barring the "future exercise" of rights of setoff and recoupment, it affirmed, on other grounds, the Bankruptcy Court's holding that the IRS could not assert the setoff and recoupment claims which the District Court understood were the subject of the appeal before it.  <u>See</u> Memorandum Decision, 486 B.R. at 44. (SPA 37-38). Nevertheless, the IRS has refused to satisfy the judgment against the United States, contending that by permitting a "future exercise" of rights of setoff and recoupment, the District Court meant to allow the IRS to re-litigate a purported

pre-confirmation right of setoff and/or a defense of recoupment for allegedly

unpaid taxes arising out of a certain transaction (the "IDT Transaction") between

PT-1 and IDT Corporation ("IDT"), even though the Bankruptcy Court had already

found that no additional taxes were due as a result of this transaction. The IDT

Transaction is explained more fully infra.[3]

In pursuing this appeal, and unless and until the District Court decides

otherwise, the Trustee is assuming that the IRS's understanding of the

Memorandum Decision is correct and that the Memorandum Decision intended to

preserve the right to re-litigate a pre-confirmation setoff right or recoupment

defense arising out of the IDT Transaction.

---

[3] Soon after the Trustee learned of the IRS' position, he moved in the
District Court for clarification of the Memorandum Decision or alternatively for an
indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure. In
response to the motion, the IRS contended that the District Court's limited reversal
of the Bankruptcy Court meant that the IRS's rights of setoff and recoupment as to
alleged pre-confirmation taxes arising out of the IDT Transaction remain extant
and until a second trial is held to determine the amount of this setoff or
recoupment, it is not obligated to pay the 2001 Refund. In that regard, on June 14,
2013 the Government initiated a "Complaint for Recoupment and Set Off" in the
United States District Court for the Eastern District of New York naming
Appellant as defendant. The matter has been assigned case number CV-13-3414.
As of the time of the submission of this brief, the motion for clarification has not
been decided by the District Court. The IRS alternatively argued in response to the
clarification motion that these purported recoupment and setoff rights should be the
subject of a remand to the Bankruptcy Court for further evidentiary hearings. See
United States v. Bond, 1:11-CV-05608 (E.D.N.Y.), Docket Nos. 29 and 30.

4

The Memorandum Decision based its conclusion that the Bankruptcy Court lacked jurisdiction to bar the IRS from a "future exercise" of setoff claims and recoupment defenses on the principle of sovereign immunity.  The Government takes the position that although the District Court never identified what specific rights of setoff and recoupment the IRS could exercise in the future, it meant to include rights of setoff and recoupment that arose prior to confirmation of PT-1's plan.  The Trustee's view is that the Memorandum Decision was referring to setoff and recoupment rights which first arose after the confirmation of PT-1's plan.

The IRS's interpretation of the Memorandum Decision, however, would mean that it is contrary to well established bankruptcy law which holds that orders confirming plans of reorganization are to be afforded res judicata effect and are binding on all parties including governmental units.  It would also mean that the District Court profoundly misread section 1141 of the Bankruptcy Code, one of the sections as to which sovereign immunity has been abrogated under 11 U.S.C. § 106(a)(1) and (2), misapplied or ignored sections 503 and 505 of the Bankruptcy Code, each of which provides for an abrogation of immunity, and failed to follow applicable Supreme Court precedent.  For example, since section 1141(d) provides that, except as may otherwise be provided in the plan or order confirming the plan, a confirmed plan of reorganization discharges any debt which arose at any time prior to confirmation, the Bankruptcy Court had jurisdiction—the IRS had no

5

immunity-- to adjudicate the Government's post-petition setoff right. The IRS interpretation of the Memorandum Decision is also inconsistent with one of the District Court's other holdings, that the IRS waived immunity as to the Trustee's Short Period refund and all "claims logically related" thereto.

The United States Courts of Appeals have jurisdiction over all final orders of the District Courts of the United States under 28 U.S.C. § 1291. In this case, when the District Court acts in its capacity as an appellate court, the Court of Appeals exercises de novo review of the legal conclusions of the Bankruptcy Court and the District Court. See, e.g., Babitt v. Vibeliunas (In re Vibeliunas), 332 F.3d 85, 90 (2d Cir. 2003).

## STATEMENT OF ISSUE ON APPEAL

The Appellant submits that the IRS has misconstrued the District Court's limited vacatur of the Bankruptcy Court's decision, and subject to possible clarification by the District Court of its Memorandum Decision, the Appellant submits that the issues on appeal are as follows: (1) Assuming the IRS is correctly interpreting the Memorandum Decision, did the District Court err in concluding that there was no abrogation of sovereign immunity so that PT-1's confirmed plan of reorganization could not bar the IRS from asserting a post-petition, pre-confirmation setoff claim and a post-petition, pre-confirmation defense of recoupment as against the 2001 Refund? (2) Was the IRS's purported setoff claim

6

and/or recoupment defense arising out of the IDT Transaction actually litigated or could have been litigated in the course of the evidentiary hearing and as such are barred by res judicata?  (3) Did the IRS waive immunity such that the Bankruptcy Court had jurisdiction to consider the IRS's setoff and recoupment defenses to the Trustee's counterclaims for the refunds arising out of the IDT Transaction?  (4) Is recoupment a defense which is waived if not raised and litigated at the time that the claim as against which recoupment is sought is tried?

## STATEMENT OF THE CASE AND FACTS

**(a)    The Bankruptcy Court Decisions**

This appeal arises out of the chapter 11 bankruptcy case of PT-1, filed on March 8, 2001.  On November 23, 2004, the Bankruptcy Court confirmed PT-1's Second Amended Joint Plan of Reorganization (the "Plan").  Decision I, 357 B.R. at 218. (A 18).  Under the Plan, PT-1's right to receive tax refunds was transferred to the Liquidating Trust, for distribution to Trust beneficiaries.  See Decision I, 357 B.R. at 218. (A 18).  In March 2004, some three years after the commencement of the bankruptcy case, but prior to confirmation, the IRS filed a proof of claim seeking "taxes, interest and penalties for the period March 9, 2001 to December 31, 2001 in the aggregate amount of $1,051,126.50 and for the tax year ended December 31, 2002 … in the aggregate amount of $7,863,701.84."  See Decision I, 357 B.R. at 218. (A 18).  PT-1 objected to the proof of claim and as permitted

7

under the then applicable bankruptcy rules, counterclaimed for a refund of taxes for the 6/30/98 Period and for the 2001 Period.[4]  In Decision I, the Bankruptcy Court expunged the IRS's proof of claim to the extent that it related to the post-petition 2002 tax year, but reserved decision as to that portion of the proof of claim that sought taxes, penalties and interests for the post-petition 2001 Short Period.  In Decision II, dated March 27, 2007, the Bankruptcy Court expunged the remainder of the IRS's proof of claim.[5]  In that decision, however, the Bankruptcy Court denied the Trustee summary judgment on his counterclaims for the two tax refunds, without prejudice to the Trustee renewing the motion on a more complete record.

The Trustee thereafter did renew his motion for summary judgment, and in Decision III dated March 31, 2009, the Bankruptcy Court granted the Trustee

---

[4]  The filing of an objection to the IRS proof of claim commenced a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure.  Pursuant to Rule 9014(d) "testimony of witnesses with respect to disputed material factual issues shall be taken in the same manner as testimony in an adversary proceeding."

[5]  As set forth in Decision III, the IRS filed four proofs of claims in the PT-1 bankruptcy case.  The initial claim was filed on February 6, 2004, an amended claim was filed on August 13, 2004, a second amended claim on March 14, 2005 and a final amended claim on August 1, 2006.  See, e.g., Decision III, 403 B.R. at 257. (A 43).  All claims have now been expunged and the disallowance of the claims is not part of this appeal.

summary judgment and awarded him a refund for the 6/30/98 Period but concluded that factual disputes over the 2001 Refund required a trial.

In opposing the Trustee's motion for summary judgment, the Government argued that the Bankruptcy Court lacked jurisdiction over the counterclaims because there was no waiver or abrogation of sovereign immunity, that the Trustee lacked standing to pursue the tax refunds, that the Anti-Injunction Act, 26 U.S.C. § 7421, barred a ruling on the 6/30/98 Refund and that the IRS had setoff and recoupment rights as against the 2001 Refund.  With the dismissal of the Government's appeal, the IRS has effectively conceded that sovereign immunity did not prevent the Bankruptcy Court from ruling on the Trustee's claims for tax refunds. It now claims, however, that the Bankruptcy Court lacked jurisdiction to bar certain of the Government's defenses to payment of the refunds through its confirmation order.

Notwithstanding that its claim for taxes for 2002 had been expunged, the IRS contended it could still employ this claim defensively, that is as either a setoff to, or recoupment against, the 2001 Refund.  See, e.g., Decision III, 403 B.R. at 275. (A 58-59).  In response, the Trustee contended, among other things, that the expungement of the claims was a determination on the merits that no tax was owed for 2002, that section 505(b) of the Bankruptcy Code barred the Government from using the alleged claim affirmatively or defensively, and that in any event the

9

confirmation order barred creditors from asserting rights of setoff and defenses which arose pre-confirmation.

The Bankruptcy Court agreed that the IRS was not entitled to use its disputed, expunged 2002 claim as a setoff to reduce any refund to which PT-1 was entitled for the 2001 Short Period.  It based its ruling on PT-1's plan of reorganization and the Court's prior order confirming the Plan and did not address any of the other arguments raised by the Trustee.  Decision III, 403 B.R. at 272-73. (A 56).  According to the Bankruptcy Court, pre-confirmation rights of setoff and recoupment can be extinguished when a plan of reorganization so provides, a determination which is not part of this appeal.  Decision III, 403 B.R. at 271-72. (A 55).  And since confirmation orders are entitled to res judicata effect, the Bankruptcy Court held that the IRS could not maintain the right to setoff its expunged 2002 claim for taxes, penalties and interest as against the 2001 Refund. Decision III 403 B.R. at 271-73. (A 55-57).

The trial directed by the Bankruptcy Court to determine what if any refund was due for the 2001 Short Period took place in July and August, 2009.  As acknowledged by the Government's counsel, the purpose of the trial was to determine the amount of refund to which PT-1 was entitled for the 2001 Short Period.  The Trustee's position was that PT-1 had net operating losses for 2000, the pre-petition period of 2001 (i.e. January 1, 2001 to March 8, 2001), 2002 and 2003

10

which when taken together reduced reported 2001 Short Period income to zero and entitled him to a full refund of the taxes paid.

The IRS disputed the deductions that PT-1 had taken for bad debts during those years and contended that if the bad debt deductions were disallowed, PT-1's net operating losses for those periods would disappear. The IRS also contended that PT-1 had improperly reported the results of a transaction by which PT-1 Communications, Inc. sold assets relating to its pre-paid calling card business to IDT.[6] At the evidentiary hearing, PT-1 demonstrated that this transaction gave rise to a net operating loss of approximately $6 million which PT-1 used to reduce Short Period income. See Memorandum Decision, 486 B.R. at 39. (SPA 33). To bolster its argument that PT-1 had failed to report approximately $30 million in revenue which it claimed was realized when the IDT sale closed, the IRS subpoenaed PT-1's former director of taxes, Ms. Rosalind Gaffney (A. 236; A. 352-408). It also examined a second witness, Mr. Stephen Buschel from BDO Seidman, PT-1's outside accounting firm, on the same subject. (A. 427-433).

---

[6] The sale of the pre-paid calling card assets to IDT as well as a subsequent settlement of a litigation which followed from the sale are together referred to as the "IDT Transaction." The IDT Transaction is described at length in Decision IV, 447 B.R. at 131-134 (A. 509-12) and in the Memorandum Decision, 486 B.R. at 39-42. (SPA 19-22).

11

After the trial record was closed, but prior to issuing a decision, the Bankruptcy Court directed the parties to appear for additional argument to address issues for which it sought further guidance. During the course of this argument, counsel for the Government conceded that the trial had included all matters relevant to the 2001 Refund request (including the IDT Transaction which gave rise to a $6 million loss) and he encouraged the Court to thoroughly consider the factual issues in dispute for all years for which the Trustee sought to apply net operating losses. Counsel believed that the more comprehensive the Court's findings the less likely there would be a need for a remand. As part of the colloquy, counsel for the IRS had the following to say:

> But we encourage the Court to come up with these findings for all the years we tried. Because Your Honor, there's going to be an appeal. I don't know whether it will be successful or not but if it is and there's a remand, do any of us really want to have another trial on the bad debt deduction.

(A. 490).

> If he [the Trustee] wins on the <u>IDT issues</u> on appeal, between that and the 2000 losses … that's probably enough to give him everything he's looking for on 2001. So but for some type of reversal on our setoff and recoupment issues, which I haven't fully processed how the permutations work on those, you're right, you probably wouldn't have to go to '02 and '03

(A. 490)

> But we certainly had a trial on 2000, 2001, 2002 and 2003, <u>and that's the case that I put on</u>. Now it's

12

important that the Court reach findings on all four of
those years for the following reasons.  The Government
has lost a lot of issues in this case already.  We may very
well appeal some of those issues.  The 505(b) issue, we
may appeal.  The recoupment and setoff issues, we may
appeal.  If we're successful on those appeals, on some of
these issues in these appeals, the findings from this
evidentiary hearing will have a collateral estoppel effect
in the resolution of that appeal.

(A. 481) (emphasis added).

In July, 2010, subsequent to this colloquy and almost a year to the day that

the evidentiary hearing began, the IRS moved the Bankruptcy Court to reopen the

record requesting permission to supplement the record as to the "IDT Issue" and

for the court to "take judicial notice of an adversary proceeding PT-1 brought

against IDT alleging that a court-approved settlement of this action resulted in the

Debtors receiving $14 million from IDT."  Decision IV, 447 B.R. at 133. (A 511).

The IRS contended, and continues to maintain, that PT-1 never reported income

pertaining to this settlement-- which was approved in 2004 prior to confirmation of

PT-1's plan-- and as a result it has the right to setoff or recoup against the 2001

Refund, the amount of tax due from this allegedly unreported transaction.[7]

---

[7]  Even though there is no indication in the Memorandum Decision that the
issue was even raised on its appeal to the District Court, the IRS contends that it is
the setoff right arising out of the IDT Transaction which was preserved by the
District Court when it ruled that the IRS could in the future exercise rights of setoff
and recoupment.  In fact, the District Court understood the IRS's setoff and
recoupment claim before it to be limited to $140,000 relating to 2002 .
(continued…)

13

Decision IV was issued on March 3, 2011.  The findings made by the Bankruptcy Court included a determination of the amount of deductions PT-1 was entitled to take for 2000, 2001, 2002 and 2003 which provided the basis for the Final Order's award of the 2001 Refund of $3,806,512.  As to the IDT Transaction, the Bankruptcy Court found that the evidence offered by the Trustee supported both the tax reporting and accounting treatment of the transaction.  See Decision IV, 447 B.R. 131-133 (A.509-10).  The Court also addressed the IRS's motion to reopen the record noting that the IRS gave no "reason for its failure to introduce the complaint or the settlement at the evidentiary hearing.  It is obvious that the IRS knew of the adversary proceeding because the IRS's counsel questioned Mr. Buschel about the adversary proceeding during cross examination."  Decision IV, 447 B.R. 115.  Notwithstanding this observation, the Bankruptcy Court actually considered this late evidence on the merits, as reflected in its finding that "[e]ven if the record were reopened to take judicial notice of the complaint and the settlement, this Court would not reach a different conclusion" as to the reopening

---

(…continued)
Memorandum Decision, 486 B.R. at 44. (SPA 24).  ("Specifically, the IRS notes that it will seek $140,000 in unpaid taxes that the Trustee allegedly owes from 2002 notwithstanding the fact that the Bankruptcy Court and now this court has held that the Trustee was discharged from this liability …").

14

of the IDT sale.  Decision  IV, 447 B.R. at 134. (A 511).  As to the IDT

Transaction, the Bankruptcy Court went on to find:

> "Therefore this Court concludes that the Debtors reported the deferred revenue as income, and that the complaint and settlement in the adversary proceeding do not establish that the Debtors obtained additional unreported consideration pursuant to the sale of PT-1 Communications' assets to IDT."

Decision IV, 447 B.R. at 134 (emphasis added). (A 511).

On April 28, 2011, the Bankruptcy Court entered a "Final Order Regarding

Contested Matter Proceeding, Docket Entry #907, Commenced By Trustee To

Disallow Claims and Administrative Expenses Of The Internal Revenue Service

And Recover Income Tax Overpayment" (the "Final Order"). (A. 519).  In the

Final Order, the Bankruptcy Court awarded the Trustee $2,178,891 plus statutory

interest as an overpayment of taxes for the tax period ended June 30, 1998 and an

additional amount of $3,806,512, plus statutory interest for the overpayment of

taxes for the 2001 Short Period.  All of the various proofs of claim by the IRS were

expunged for the reasons set forth in the four decisions of the Bankruptcy Court.

**(b)    The Memorandum Decision**

The IRS timely appealed the Final Order and the Trustee cross-appealed so

much of the Final Order that did not permit the Trustee to use net operating losses

15

incurred in 2003 to reduce 2001 Short Period Income.[8]  On September 17, 2012, the District Court issued its corrected Memorandum Decision.  The Memorandum Decision affirmed the Final Order of the Bankruptcy Court "substantially for the reasons set forth in the four interlocutory orders … with one exception." (SPA 11-12).  The one exception was that the District Court disagreed that the Bankruptcy Court had jurisdiction in its confirmation order to enjoin the IRS's "future exercise" of its rights to setoff and recoupment. (SPA 12).  The Memorandum Decision, however, did not specify what, if any, rights of setoff or recoupment were not subject to the Plan injunction, only that the Bankruptcy Court could not impose a blanket bar against the future exercise of such rights.[9]  The Trustee understood the ruling to apply to rights of setoff and recoupment which might arise post-confirmation.

 At the outset it is not entirely clear that the Bankruptcy Court even enjoined the IRS from the "future exercise" of rights of recoupment or setoff.  Decision III

---

[8]  In his Notice of Appeal to the Court of Appeals, the Trustee also appealed the District Court's affirmance of the Bankruptcy Court's refusal to allow the Trustee to apply 2003 net operating losses to the 2001 Short Period.  The Trustee is not pursuing that issue on this appeal.

[9]  The Trustee understood this to mean that the Bankruptcy Court could not bar the IRS from exercising setoff and recoupment rights which first arose post-confirmation.  This is one of the issues raised in this clarification motion to the District Court.

only addressed – because that was all that was before the Bankruptcy Court – the IRS's claim that notwithstanding the expungement of its 2002 claim, it could use setoff or recoupment, defensively to reduce the 2001 Refund for the allegedly and now expunged unpaid taxes for 2002, a decision which the District Court affirmed on other grounds.

To the extent the Memorandum Decision is understood as holding that the future exercise of post-petition, pre-confirmation claims of governmental units, whether asserted through setoff or otherwise, cannot be enjoined by a plan of reorganization, it rested on the principle of sovereign immunity.  The District Court reasoned that an abrogation of immunity must be expressly stated and the IRS understands this ruling as holding that there is no abrogation of immunity in the Bankruptcy Code which gives the Bankruptcy Court jurisdiction, through a plan of reorganization, to bar a governmental entity from exercising post-petition, pre-confirmation rights of setoff and recoupment.  The District Court posed the question as follows:  "The question, therefore, is under what statute has the IRS waived sovereign immunity such that it can be enjoined from exercising its rights to setoff and recoupment?"  Memorandum Decision, 486 B.R. at 43. (SPA 36).

The District Court acknowledged that immunity was abrogated as to section 1141 of the Bankruptcy Code and that under section 1141(a) a government entity would generally be bound by a plan and an order confirming a plan.  However, the

17

Court concluded that section 1141(a) was limited to creditors and equity security holders, among others, and to the extent the IRS held post-petition claims, it was not a "creditor."  In concluding that the abrogation of immunity in section 1141(a) was limited to pre-petition claims held by a government unit, the District Court looked to the definition of creditor in 11 U.S.C. § 101(10) but failed to address the plain language of 11 U.S.C. § 1141(d) which provides that an order confirming a plan binds holders of "debts" which are obligations which arise at any time prior to confirmation and are not limited to pre-petition claims.

Notwithstanding its view as to the inapplicability of the plan injunction to "future exercises" of setoff and recoupment rights, the District Court had this to say about the actual post-petition setoff and recoupment claims raised by the IRS on its appeal:

> That is not to say, however, that the IRS is free to exercise its rights to setoff and recoupment against each of the potential liabilities of the Trustee it identifies in its papers ….  The Trustee argued below that there is no right to setoff as a result of this discharge [under 11 U.S.C. § 505(b)], which argument the Bankruptcy Court elected not to address ….

Memorandum Decision, 486 B.R. at 44. (SPA 37).

The conclusion that the District Court reached was that with respect to the setoff and recoupment rights that the IRS had raised below on its appeal to the District Court, and despite its disagreement with the Bankruptcy Court over the

18

impact of the plan injunction, the IRS had no right to setoff or recoup any amounts

due the Trustee under the Final Order:

> However, when the IRS failed to comply with the
> procedure set forth in Section 505(b)(2) for the tax year,
> PT-1 no longer owed it anything by way of additional
> taxes.  When one is no longer liable to another, it is only
> natural to conclude that one does not owe that party
> anything either.  And without anything <u>owed to it, the
> IRS has nothing to setoff against the refund it owes to the
> Trustee</u>.

Memorandum Decision, 486 B.R. at 45 (emphasis added). (SPA 38).

Lastly, the District Court affirmed the Bankruptcy Court's findings that PT-1

had accurately reported the results of the IDT Transaction.  Memorandum

Decision, 486 B.R. at 41-42. (SPA 35).  The District Court noted that in

contending that PT-1 owed more taxes as a result of the IDT Transaction (and for

which it now claims to have rights of setoff and recoupment), the IRS was relying

solely on a sale agreement between PT-1 and IDT and "an adversary complaint

filed by PT-1 against IDT in its own bankruptcy proceeding and a settlement

agreement between PT-1 and IDT for approximately $14 million."[10] (SPA 33).

---

[10]  As noted <u>supra</u>, the Trustee has moved the District Court for an order
clarifying the Memorandum Decision as to the specific setoff and recoupment
rights the District Court intended to allow the IRS to assert.  Based upon the
pleading filed in opposition to that motion,  the IRS's position  is that it still can
assert setoff and recoupment rights arising out of the IDT Transaction.  <u>See</u> ft. nt. 2
<u>supra</u>.

The District Court noted that the Bankruptcy Court did not exclude these documents from the trial record on the basis that its prior ruling on the res judicata effect of the plan injunction rendered them irrelevant.  Instead, it agreed that the Bankruptcy Court properly exercised its discretion in not considering this evidence because it was first offered almost a year after the trial had ended.  It agreed with the Bankruptcy Court that it was the Government's own neglect which was at the core of the decision..  According to the District Court:

> Most importantly, the IRS has utterly failed to justify its failure to introduce these documents during the evidentiary hearing.  The IRS contends on appeal that it neglected to do so because the Trustee first construed the sale as a loss in a second post-trial brief filed in May 2010.  The IRS filed its motion to re-open two months later.  However, I cannot accept that the IRS was unaware of the Trustee's position on the proper tax treatment of the sale until that late in these proceedings.  As the Bankruptcy Court found, and as confirmed by the transcript of the evidentiary hearing, Gaffney unequivocally testified that PT-1 reported a $5.8 million gain on the sale by subtracting the accounts receivable sold to IDT from the deferred revenue of PT-1 retained and realized.  … The IRS has therefore failed to offer any justification for its failure to offer these documents into evidence during the hearing, and this factor precludes me from concluding that the Bankruptcy Court abused its discretion in refusing to reopen the record.

Memorandum Decision, 486 B.R. at 41-42. (SPA 34-35).

The District Court continued in its criticism of the IRS:  "[N]evertheless, the IRS neglected to raise any issue or assert any argument with regard to other

20

consideration PT-1 may have received as a result of the sale at that time. Rather, it awoke to these issues over a year after the evidentiary hearing, and over four months after oral argument on the evidence had concluded. This extreme example of both delay and a lack of justification establishes that the Bankruptcy Court did not abuse its discretion in denying the IRS's motion to open the record." Memorandum Decision, 486 B.R. at 41-42. (SPA 35).

## SUMMARY OF THE ARGUMENT

On July 2, August 26 and August 27, 2009, the Bankruptcy Court conducted an evidentiary hearing to determine the amount of tax refund, if any, to which the Trustee was entitled for the 2001 Short Period. Its findings and conclusions as to the amount of the refund were set forth in Decision IV, and in the Final Order it awarded the Trustee $3,806,512.00 (A. 509, 520) plus what is now more than ten years of interest. All proofs of claim by the IRS were also expunged by the Final Order for the reasons set forth in the Bankruptcy Courts' four opinions. The Memorandum Decision affirmed the Final Order and all of the findings and conclusions set forth in the four decisions except to the extent that it found that the Bankruptcy Court had enjoined the IRS from the "future exercise" of rights of setoff and recoupment. (SPA 12, 39). The Memorandum Decision did not identify any specific setoff claim or recoupment defense which the IRS might exercise in the future. Notwithstanding this <u>dicta</u>, the District Court concluded that, as to the

21

recoupment and setoff rights it understood were the subject of the appeal, they were barred on other grounds. (<u>See</u> SPA 37-39).  Nevertheless, the IRS contends that the Memorandum Decision meant to permit it to re-litigate, as either a setoff to or defense against the 2001 Refund, an alleged undetermined under payment of taxes which the IRS asserts arose out of the IDT Transaction and should have been reported in either 2001 or 2004.

To the extent that the IRS is correct and the Memorandum Decision stands for the proposition that the Bankruptcy Court lacked jurisdiction on the basis of sovereign immunity to bar the IRS' post-petition, pre-confirmation setoff claim and recoupment defense arising out of the IDT Transaction, it was in error.  The Government's interpretation of the Memorandum Decision means that although there was a clear and now conceded waiver of immunity such that the Bankruptcy Court could decide the Trustee's refund claims, the Bankruptcy Court lacked jurisdiction to rule on the timeliness of a defense to the those claims.  That simply cannot be the case.  If the Memorandum Decision is interpreted as holding that sovereign immunity presents a jurisdiction bar to a bankruptcy court's considering the merits or timeliness of a governmental entity's defense to a claim asserted against it as to which there is no immunity, it is plainly in error.

Under section 106(a)(1) and (2) of the Bankruptcy Code, governmental units' immunity is abrogated with respect to section 1141.  Section 1141(d)

expressly provides that confirmation of a plan discharges the debtor "from any debt that arose before the date of such confirmation…."  As a result, once a plan is confirmed it binds a governmental entity such as the IRS even with respect to administrative claims and the confirmation order's <u>res judicata</u> effect applies to the governmental unit.  Moreover, to the extent that the Memorandum Decision held that the Bankruptcy Court lacked jurisdiction to bar these post-petition, pre-confirmation claims and defenses, it is contrary to the Supreme Court's holdings in <u>Tennessee Students Assistance Corporation v. Hood</u>, 541 U.S. 440, 124 S. Ct. 1905 (2004) and <u>Central Virginia Community College v. Katz</u>, 546 U.S. 356, 126 S. Ct. 990 (2006).  The Bankruptcy Court's holding that the plan and confirmation order acted to bar pre-confirmation rights of setoff and recoupment was therefore correct.

After the ruling in Decision III that the plan and confirmation order had <u>res judicata</u> effect on the Government's claim for a setoff of underpayment of taxes in 2002, the Bankruptcy Court held the 2009 evidentiary hearings to determine the amount of the 2001 Refund.  To the extent that the Government had a setoff right or a defense of recoupment as to years other than 2002, it was required to present evidence at the hearings in support of its position.  Similarly, to the extent that the Government claimed that taxes were due arising out of the IDT Transaction, for which it now claims a setoff and recoupment right as against the amount of the

23

2001 refund it was required to present evidence to support this claim at the hearings held to decide the amount of the refund.

The IRS cannot fairly argue that because of the ruling in Decision III it was precluded from presenting evidence to substantiate its setoff and recoupment rights arising out of the IDT Transaction. In the first instance, it never moved the Bankruptcy Court for permission to present evidence as to this setoff claim or recoupment defense, it cannot point to anything in the record to show that the Bankruptcy Court denied it the right to present such evidence and there is nothing in Decision III which can be fairly construed as a bar to such evidence. In fact, the IRS actually presented evidence which it claimed showed that the IDT Transaction was not properly reported in PT-1's tax returns and the Bankruptcy Court accepted the evidence and considered the argument on its merits. Third, during post-hearing oral argument, counsel for the IRS acknowledged that the purpose of the evidentiary hearing was to try all issues relevant to the 2001 Refund and never complained to the Bankruptcy Court that he had been prevented from offering evidence in support of the IRS's alleged right of setoff. Lastly, almost one year after the evidentiary hearing concluded, the IRS sought to reopen the record to submit <u>additional</u> evidence in support of its claim that it could setoff or recoup an underpayment of taxes arising out of the IDT Transaction as against the 2001 Refund. The IRS's motion was an express acknowledgement that this evidence

could have been offered at the evidentiary hearings and was not barred by Decision III.  In Decision IV, the Bankruptcy Court held the motion to be untimely but still considered the evidence offered on its merits and concluded that it would not change its view as to the appropriate amount of the 2001 Refund. (A 511-12).  In other words, the IRS's setoff and recoupment rights which it claims the Memorandum Decision preserved for future litigation were actually raised or could have been raised at the evidentiary hearing.  Despite how the Government now interprets the Memorandum Decision, re-litigation of these issues is barred by res judicata.

## ARGUMENT

### POINT I.

**THE DISTRICT COURT ERRED WHEN IT HELD THAT PT-1'S CONFIRMED PLAN OF REORGANIZATION DID NOT BAR THE IRS FROM ASSERTING A PRE-CONFIRMATION SETOFF CLAIM OR A PRE-CONFIRMATION RECOUPMENT DEFENSE**

It is well settled that orders confirming plans of reorganization are entitled to res judicata effect.  See, e.g., Travelers Indem. Co. v. Bailey, 557 U.S. 137, 153-54, 129 S. Ct. 2195, 2206-07 (2009); Stoll v. Gottlieb, 305 U.S. 165, 170-71, 59 S. Ct. 134, 136-37 (1938); Silverman v. Tracar, S.A. (In re Am Preferred Prescription, Inc.), 255 F. 3d 87, 92 (2d Cir. 2001); First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough, L.L.P. (In re Varat Enters., Inc.), 81 F.

3d 1310, 1315 (4th Cir. 1996); Republic Supply Co. v. Shoaf, 815 F. 2d 1046,

1050-54 (5th Cir. 1987); see also United States v. Carolina Parachute Corp., 907

F.2d 1469, 1473 (4th Cir. 1990) ("The holding of the bankruptcy court that the

terms of the confirmed plan were res judicata as to the government is supported by

prior decisions of courts that have addressed similar issues").

In this case, PT-1's confirmed plan contained an express provision barring

holders of post-petition, pre-confirmation rights of setoff and recoupment from

exercising those rights post-confirmation.  The IRS did not object to confirmation

and as the Bankruptcy Court noted, these provisions are appropriate in plans of

reorganization.[11]  Although the District Court recognized that confirmation orders

are entitled to res judicata effect, it held that the plan could not bind the IRS (or

presumably any governmental entity) as to post-petition matters because there was

no abrogation of immunity.  In so holding, the District Court committed plain error

and implicitly took issue with this Court's comment that "11 U.S.C. § 106

abrogates federal sovereign immunity with respect to most aspects of bankruptcy

administration…."  Presidential Gardens Assocs. v. United States ex. rel. Sec. of

Housing and Urban Dev., 175 F.3d 132, 142 (2d Cir. 1999).

---

[11]  Because the IRS withdrew its appeal, that issue is not before the Court.
The only issue to be addressed on appeal in regard to the plan is whether this plan
provision is unenforceable as to the IRS on the ground of sovereign immunity.

While the District Court correctly noted that the Government's immunity was expressly abrogated as to matters within the scope of section 1141, for some reason it limited its analysis to section 1141(a), making no mention of section 1141(d) which provides that a plan and an order of confirmation discharges a debtor "from any debt that arose before the date of such confirmation…."  A debt is defined in 11 U.S.C. § 101(12) to mean "liability on a claim" and claim means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…."  11 U.S.C. § 101(5).  This definition has no temporal limitations and is universally understood to mean pre-petition and post-petition, pre-confirmation claims.  See Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.), 468 B.R. 603, 615 (S.D.N.Y. 2012) ("It is well established that confirmation of a chapter 11 plan discharges all debts that arose prior to confirmation"); R.L. Wright v. Centennial Health Care Corp., 383 B.R. 355, 357 (D.D.C. 2008) ("As a general rule, post-petition/pre-confirmation claims are discharged as part of bankruptcy reorganization"); In re Arch Wireless, 332 B.R. 241 (Bank. D. Mass. 2005); In re Space Bldg. Corp., 206 B.R. 269 (D. Mass. 1996).

The IRS's setoff and recoupment rights are debts that the Government claims are owed by PT-1 and fall squarely under section 1141(d); and so immunity

27

has been abrogated and the Bankruptcy Court had jurisdiction to enter an order which would be as binding on the Government as on all other holders of post-petition claims.

Moreover, the District Court's immunity analysis ignored sections 503 and 505 of the Bankruptcy Code, as to which there are also express abrogations of immunity. Section 505 grants bankruptcy courts sweeping authority over tax related disputes. Section 505(a)(1) provides that a bankruptcy court can determine the legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before an adjudicated by a judicial or administrative tribunal. This authority is not limited to pre-petition tax claims. This jurisdictional grant is supplemented in section 505(a)(2)(B) which allows a bankruptcy court to adjudicate a debtor's claims for a tax refund.

Under Section 503(b) bankruptcy courts have authority to adjudicate administrative claims including administrative tax claims under 11 U.S.C. § 503(b)(1)(B). The IRS's setoff rights are claims, the adjudication of which are fully within that statute. If immunity has been abrogated as to tax matters and as to the adjudication of post-petition tax claims, how could it be that a bankruptcy court lacked the jurisdiction to adjudicate a tax claim when it is asserted only by way of setoff?

28

The District Court's jurisdictional and immunity analysis also failed to consider the in rem aspects of a bankruptcy court's jurisdiction.  Gardner v. NJ, 329 U.S. 565, 67 S. Ct. 467 (1947).  Based upon fairly recent, applicable Supreme Court precedent, in rem jurisdiction allows a Bankruptcy Court to enter orders which bind governmental units even if there has been no waiver or abrogation of immunity.

In Tennessee Student Assistance Corporation v. Hood, 541 U.S. at 445, the Tennessee Student Assistance Corporation ("TSAC") had moved to dismiss Pamela Hood's complaint for discharge of a student loan, claiming sovereign immunity.  This motion was denied and the denial was affirmed by the Sixth Circuit's Bankruptcy Appellate Panel as well as the Sixth Circuit itself.  Without addressing the question as to whether TSAC had immunity from suit, the Supreme Court held that the Bankruptcy Court had the right to decide the dischargeability complaint pursuant to its in rem jurisdiction and that its order was binding on TSAC.

The Supreme Court in Hood noted that bankruptcy courts have "exclusive jurisdiction over a debtor's property, wherever located, and over the estate" and that a bankruptcy court can provide a debtor with relief "despite the lack of participation of all of his creditors, because the court's jurisdiction is premised on the debtor and his estate and not his creditors."  541 U.S. at 447.  "Under our

29

longstanding precedent, States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors." Id. at 448. Hood held that a bankruptcy court, through its in rem jurisdiction, can bind a governmental unit to its orders even if the unit had sovereign immunity. See also Cent. VA Cmty. Coll. v. Katz, 546 U.S. 356, 363-64 ("Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all the debtor's property, the equitable distribution of that property among the debtor's creditors and the ultimate discharge …").

The Trustee submits that as applied to this appeal, chiefly Hood, but also Katz, mean that even if the IRS had immunity as to its post-petition setoff and recoupment claims, the Bankruptcy Court's properly entered confirmation order is binding on it. In chapter 11 cases, the discharge, which the Supreme Court noted was at the core of all bankruptcy proceedings, arises from the confluence of section 1141, the debtor's plan of reorganization and the order confirming the plan. It follows from the Bankruptcy Court's in rem jurisdiction over PT-1's assets and the administration of PT-1's estate that its confirmation order binds the IRS even had it not appeared in the case and even if it had immunity.[12]

---

[12] As the record reflects, the IRS appeared in the case, filed four proofs of claim and requests for payment of administrative expenses and litigated issues relating to its setoff and recoupment rights in the Bankruptcy Court. Indeed, as (continued…)

# POINT II.

## THE IRS'S CLAIM THAT IT CAN EXERCISE A RIGHT OF SETOFF OR RECOUPMENT AS TO THE ALLEGED UNDERPAYMENT OF TAXES ARISING OUT OF THE IDT TRANSACTION IS BARRED BY RES JUDICATA

Now that the Government has withdrawn its appeal, the findings of the

Bankruptcy Court, as affirmed by the District Court, are entitled to res judicata

effect.  "Under the doctrine of res judicata, or claim preclusion '[a] final judgment

on the merits of an action precludes the parties or their privies from relitigating

issues that were or could have been raised in the action.'"  St. Pierre v. Dyer, 208

F.3d 394, 399 (2d Cir. 2000) (quoting Federated Dep't Stores, Inc. v. Moitie, 452

U.S. 394, 398, 101 S. Ct. 2424 (1981)).  In this case, the IRS claim that PT-1 owes

more taxes arising out of the IDT Transaction, as to which the IRS is entitled to

exercise a right of setoff or recoupment, was actually raised and certainly could

have been raised in connection with the evidentiary hearing held to determine the

amount of the 2001 Refund.  The IRS offered evidence regarding the transaction at

the evidentiary hearing, sought to reopen the record almost a year after the hearing

concluded to offer additional evidence and the Bankruptcy Court made an express

finding that the IDT Transaction was properly reported and that the newly

---

(…continued)
reflected in its opposition to the clarification motion, it is suggesting that the issue be remanded to the Bankruptcy Court to hold additional evidentiary hearings.

50810/0001-9684300v6

proffered evidence did not change its view as to the merits of the IRS proposed setoff.

During the course of the evidentiary hearing, the Government subpoenaed Ms. Rosalind Gaffney, formerly PT-1's director of taxes, as a witness. In his examination of Ms. Gaffney, counsel for the IRS asked how PT-1 accounted for the revenue it received from the sale of its pre-paid calling cards,[13] (A. 269-71) and questioned her about the sale of this asset to IDT. (A. 272-73). He also inquired as to the consideration PT-1 received from IDT (A. 366, 375) and the structure of the sale transaction. (A.272-273 366-67).

Moreover, the Government was aware of the post-closing dispute between PT-1 and IDT and the subsequent Bankruptcy Court approved settlement of the dispute while the trial was being held. The following colloquy between the Court and one of the Government's counsel shows that the IRS concluded these issues were germane to the trial and relevant to the determination of the 2001 Refund:

MR. CIRENZA:    Your Honor, there was <u>significant discussion, testimony</u> about the prepaid calling – the sale of the prepaid calling cards and the ultimate question is whether the revenue was properly recorded, when it was recorded, if it was recorded. And it is Government's understanding that there was litigation

---

[13]  The pre-paid cards held in inventory by PT-1 and the accounts receivable from the sale of the cards were the assets sold to IDT pursuant to the IDT Transaction.

32

on this issue with regard to the transaction before you were assigned to this case when it was before Judge Duberstein. I'm trying to find out what if any – if he knows about that because as I understand there had to be a payment of some 14 million dollars in the year 2004 by the – to the – debtor and I'm just trying to inquire what –

THE COURT:    Well, what does that have to do with the issue that – the issues that are being determined in this proceeding?

MR. CIRENZA:    Well, it may say why as to whether or not  the way they recorded their transaction was proper.

THE COURT:    How? in what way?

MR. CIRENZA:    Well, because if they had to pay any money under the settlement, it's my understanding that there was – I don't have the pleading in front of me – that there was allegation of fraudulent conveyance which means there was a transfer with no consideration.  And if there was a transfer of no consideration, how can there be any gain at all unless there was some other assets that were sold that we're not aware of and –

THE COURT:    So that would result in –

MR. CIRENZA:    Well –

THE COURT:    – a reduction of their income of a larger refund, is what you're saying?

MR. CIRENZA:    Of – no.  Of the reported gain, but they – but it's the Government's contention that they never reported the 30 million dollars in deferred income, that they never recognized that.  And I think the testimony by Ms. Gaffney was  that they didn't recognize it.  I can move on, Your Honor.

(A 432-33) (emphasis added).

33

In July, 2010, the IRS moved to reopen the record of the evidentiary hearing, arguing that the complaint PT-1 filed against IDT and the follow-on Bankruptcy Court approved settlement proved Mr. Cirenza's point that PT-1 had not reported all of the income it had received from the IDT Transaction.  After criticizing the IRS for its year delay in offering this purported proof, in Decision IV the Bankruptcy Court nevertheless considered the proof and found that it did not alter its finding that PT-1 properly reported all of the income it received from the IDT Transaction.  Decision IV, 447 B.R. at 134. (A 511).  These findings are res judicata and bar the Government from re-litigating, in the guise of a right to setoff or recoupment, either on a remand or in a new lawsuit, its argument that it is entitled to reduce the 2001 Refund awarded by the Bankruptcy Court.

Finally, and notwithstanding the Bankruptcy Court's Decision III holding that the confirmation order barred the IRS from asserting setoff or recoupment rights allegedly arising out of an underpayment of 2002 taxes, the IRS was afforded every opportunity to present its evidence as to the tax impact on PT-1 of the IDT Transaction.  Indeed:  (1) the Government has never claimed that the Bankruptcy Court prevented it from offering evidence relevant to the issue; (2) the IRS did offer evidence on the IDT Transaction through its direct examination of Ms. Gaffney; (3) the IRS's counsel acknowledged the relevance of the issue to the hearing when he moved to reopen the trial record to offer additional evidence; and

(4) at the post-trial oral argument, the IRS counsel implored the Court to make detailed findings and to address all issues relating to those years for when the Trustee sought to apply net operating losses to reduce Short Period income which included the year of the IDT sale.  In other words, the record shows not only that the IRS could have litigated the issues relevant to the IDT Transaction, it actually did.  After ten years of litigation, a trial, four separate opinions by the Bankruptcy Court and now two appeals, an end to this litigation through application of <u>res judicata</u> is both needed and required.

## POINT III.

### THE IRS WAIVED IMMUNITY AND THE BANKRUPTCY COURT HAD JURISDICTION TO ADJUDICATE ITS PRE-CONFIRMATION SETOFF CLAIMS

The Trustee's refund claims were adjudicated by the Bankruptcy Court as counterclaims to the four pre-petition and administrative proofs of claim filed by the IRS.  Under section 106(b) of the Bankruptcy Code, a governmental unit that has filed a proof of claim waives "sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose."  11 U.S.C. § 106(b).  The IRS argued that it had not filed a "proof of claim," arguing that the term is limited to pre-petition claims.  It maintained that its post-petition claims were proofs of administrative expenses and section 106(b)

which refers to "proofs of claim" was inapplicable. The District Court rejected this argument holding that "the Trustee's claim for a Short Period refund is sufficiently related to the IRS's claims to fall under the ambit of 11 U.S.C. § 106(b)." Memorandum Decision, 480 B.R. at 31. (SPA 26). Notwithstanding its limited reversal of the Bankruptcy Court, the District Court issued the following ruling:

> Alternatively, I find that the IRS's request for Short Period taxes also provides a basis for Section 106(b) jurisdiction. The IRS does not dispute that this request arises out of the same transaction or occurrence as the Trustee's Short Period refund claim. Rather, the IRS contends that because it filed its request for Short Period taxes three days after the Trustee's claim, the Trustee's claim cannot be considered a "counterclaim." However, by the time the Bankruptcy Court actually resolved both parties' claims, the IRS had indisputably waived sovereign immunity in the Bankruptcy Court for all claims logically related to its request for Short Period taxes.

480 B.R. at 31-32. (SPA 26).

With the IRS's withdrawal of its appeal from the Memorandum Decision, these holdings are binding and not part of the present appeal.

The District Court's conclusion that immunity had been waived as to "all claims logically related" to the Trustee's request for the 2001 Refund demonstrates the implausibility of the Government's interpretation of what was intended by the District Court's limited reversal of the Bankruptcy Court. According to the IRS, the Memorandum Decision means that when the District Court found that the

36

Bankruptcy Court could not bar the future exercise of rights of setoff and recoupment on sovereign immunity grounds, it was referring to the IRS's purported pre-confirmation right to setoff or recoup an alleged underpayment of taxes arising out of the IDT Transaction, and not claims first arising post-confirmation.  This interpretation, however, ignores the District Court's holding that the IRS waived immunity as to the Trustee's tax refund counterclaims and "indisputably waived sovereign immunity in the Bankruptcy Court for all claims logically related to its request for Short Period taxes."  Memorandum Decision, 486 B.R. at 32. (SPA 26).

Indeed, the District Court went on to dismiss another IRS argument, that it had not waived immunity under section 106(b) because its claims were "rejected by the Bankruptcy Court as untimely and never adjudicated on the merits."  See Memorandum Decision, 486 B.R. at 32 (SPA 26), holding that "Section 106(b) applies even when claims filed by the IRS are dismissed as untimely."

While these rulings are not subject to appeal, they are relevant to understanding what setoff and recoupment rights were intended to be preserved under the Memorandum Decision.  Clearly, when the District Court held that immunity was waived so as to permit the Bankruptcy Court to adjudicate all claims by the IRS for underpayment of post-petition, pre-petition taxes, it necessarily included any taxes allegedly arising out of the IDT Transaction.  It would make no

37

sense to conclude that while immunity was waived to determine if any tax was affirmatively due, it was not waived to the extent that the IRS sought to use the same underpayment defensively in the form of a setoff or recoupment or to prevent the Bankruptcy Court from ruling that the defense was time barred.

## POINT IV.

## THE IRS CLAIMS FOR TAXES ARISING OUT OF THE IDT TRANSACTION DO NOT FALL WITHIN THE RECOUPMENT DOCTRINE

In Westinghouse Credit Corporation v. D'Urso, 278 F.3d 138 (2d Cir. 2002) ("D'Urso"), the Second Circuit summarized the law of recoupment.  Citing to Malinowski v. New York State Department of Labor (In re Malinowski), 156 F.3d 131 (2d Cir. 1998), where the Court held that "even claims predicated on a single contract will be ineligible for recoupment" when the "contract itself contemplates the business to be transacted as discrete and independent units."  In re Malinowski, 156 F.3d at 135.  For recoupment to be applicable, a creditor's claim must arise out of the "identical transaction as the debtor's …."  Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1080 (3rd Cir. 1992), cited favorably in D'Urso.

For example, in In re University Medical Center, the Secretary of Health and Human Services (the "Secretary") claimed that he was entitled to recoup pre-petition overpayments of Medicare reimbursements from post-petition reimbursements due the debtor.  The Secretary argued for an expansive

38

interpretation of "transaction," akin to the test employed for compulsory

counterclaims under the Federal Rules of Civil Practice.  The Third Circuit rejected

the argument, citing to its earlier decision in Lee v. Schweiker, 739 F.2d 870 (3rd

Cir. 1984), that a "mere logical relationship is not enough" and for the single

transaction prescription to apply, it is not sufficient that the same two parties are

involved and the claims arise out of the same subject matter.  See also Anes v.

Dehart (In re Anes),195 F.3d 177, 182 (3d Cir. 1999) (reasoning that recoupment

exists when "two debts arise out of the same transaction"); Conoco, Inc. v. Styler

(In re Peterson Distrib., Inc.); 82 F.3d 956, 959 (10th Cir. 1996) ( reasoning that

recoupment requires the same transaction, is narrowly construed in bankruptcy and

even claims arising out of the same contract may not give rise to a recoupment

defense); Davidovich v. Welton (In re Davidovich), 901 F.2d 1533, 1538 (10th Cir.

1990) (reasoning that recoupment is a judicially created equitable rule of joinder

and "courts have generally only found this 'same transaction' requirement to be

satisfied when the debts to be offset arise out of a single integrated contract or

similar transaction.")

Here, the refund of an overpayment of taxes for the 2001 Short Period is as a

result of thousands of separate transactions, not a single transaction. Taken

together those transactions gave rise to operating losses over multiple tax periods.

The Bankruptcy Court generally described the losses, which it found applicable to reduce Stub Period income, as follows:

    (a)    a deduction on the Stub Period return arising from PT-1 Long Distance's operational bad debt;

    (b)    an "M-1" adjustment on the Stub Period return relating to the sale of assets to IDT;

    (c)    a deduction on the Short Period return arising from PT-1 Long Distance's operational bad debt;

    (d)    a write-off of the unamortized basis of an "IRU" (Indefeasible Right of Use");

    (e)    a deduction on the 2002 tax return arising out of PT-1 Long Distance's operational bad debt; and

    (f)    an "M-1" adjustment on the 2002 tax return.

Decision IV, 447 B.R. 141-142. (A 517-18).

The single transaction test means that in this case the IRS cannot in the future exercise a recoupment defense based upon an alleged underpayment of taxes arising out of the IDT Transaction. Even if the IRS had such a defense it was required to raise it and submit proof in support of the defense at the evidentiary hearing. By its very nature, recoupment cannot be preserved for a future litigation.

## **CONCLUSION**

For the reasons set forth herein, to the extent that the Memorandum Decision allows the IRS to assert, by way of setoff or recoupment, claims arising out of the IDT Transaction, it should be reversed and the decision of the Bankruptcy Court on this issue affirmed.

DATED:   New York, New York    Respectfully submitted,
         July 19, 2013

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.,
*Attorneys for Edward P. Bond, Trustee of
the PT-1 Liquidating Trust*


By:   ___/s/ Laurence May_____
      Laurence May, Esq. (LM-9714)
      Therese Scheuer, Esq.
      900 Third Avenue. 16th Floor
      New York, New York 10022
      (212) 752-8000

41

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed.R. App. P.32(a)(7)(B) because:

   ☑  this brief contains [    10,788    ]    words, excluding the
        parts of the brief exempted by Fed. R.App. P. 32(a)(7)(B)(iii), *or*

   ☐  this brief uses a monospaced typeface and contains    [state the number of]
        lines of text , excl uding the pa rts of the bri ef
        exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the
        type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑  this brief has been prepared in a proportionally spaced typeface
        using [ Microsoft Word 2003                                    ] in
        [ Times New Roman, 14 point font      ], *or*

   ☐  this brief has been prepared in a monospaced typeface using
        [ state name and version of word processing program  ] with
        [ state number of characters per inch and name of type style ].

(s)    _____

Attorney for    Edward P. Bond, Defendant/Appellant
        _____

Dated:    July 25, 2013
        _____

**SPECIAL APPENDIX**

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Memorandum and Decision of the Honorable Brian
   M. Cogan, dated September 17, 2012....................   SPA-1

Final Judgment, dated September 17, 2012...............   SPA-40



486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

H

United States District Court,
E.D. New York.
UNITED STATES of America, Plain-
tiff/Appellant/Cross–Appellee,
v.
Edward P. BOND, Liquidating Trustee of the Liqui-
dating Trust for PT–1 Communications, Inc., PT–1
Long Distance, Inc. and PT–1 Technologies, Inc.,
Defendant/Appellee/Cross–Appellant.

No. 11 Civ. 5608 (BMC).
Sept. 17, 2012.

**Background:** In separate proceedings, trustee of
liquidating trust established under debtor's confirmed
Chapter 11 plan successfully moved to expunge proof
of claim filed by the Internal Revenue Service (IRS),
357 B.R. 217, succeeded in part in expunging certain
penalty claims included by the IRS in administrative
expense claim, 386 B.R. 402, obtained authorization
to file stand-alone return for debtor-corporations that
were part of affiliated group of corporations, 403
B.R. 250, and obtained determination of debtors' enti-
tlement to federal income tax refund, both for "stub
period" running from the first day of tax year in
which bankruptcy petitions were filed to petition date
and for "short period" constituting the remainder of
that tax year, 447 B.R. 115, in separate orders entered
by the Bankruptcy Court, Carla E. Craig, Chief
Judge. Appeal was taken.

**Holdings:** The District Court, Cogan, J., held that:
(1) tax refund claims asserted by trustee were assert-
ed "on behalf of the bankruptcy estate," as required
for bankruptcy court to be able to adjudicate claims,
despite contention by the IRS that estate had ceased
to exist once plan was confirmed;

(2) bankruptcy statute permitting court to determine
the right of estate to tax refund for up to 120 days
after "the trustee" properly requests such a refund
from governmental unit was a timing and exhaustion
of remedies provision, that did not limit bankruptcy
court's ability to adjudicate tax disputes to only those
brought by bankruptcy trustees;

(3) exhaustion of administrative remedies provision
was equally applicable to refund claims asserted as
counterclaims to tax, penalty, and interest claims as-
serted by the IRS;

(4) trustee's failure to first exhaust his administrative
remedies before asserting tax refund counterclaim did
not prevent trustee from curing this jurisdictional
defect at later date;

(5) government, by filing request for allowance of
such taxes and penalties as administrative expense of
Chapter 11 estates, did not waive its sovereign im-
munity as to trustee's refund claim;

(6) IRS acted in arbitrary and capricious manner in
refusing to accept deconsolidated "stub period" re-
turn from Chapter 11 debtor;

(7) bankruptcy court was without jurisdiction to en-
join the IRS, based on its failure to object to provi-
sion in debtors' confirmed Chapter 11 plan barring
the exercise of setoff and recoupment rights, from
future exercise of such rights against debtor; and

(8) IRS's failure, in response to request for determina-
tion of unpaid tax liability incurred during admin-
istration of Chapter 11 case, to provide notification
of any tax due within 180 days, served to discharge es-
tate, trustee, debtors, and any successor to debtors of
any liability for such tax.

Affirmed in part and reversed in part.

West Headnotes

**[1] Bankruptcy 51 ⟨key⟩2055**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

51 Bankruptcy
    51I In General
        51I(C) Jurisdiction
            51k2055 k. Tax controversies. Most Cited Cases

    Bankruptcy court had "core" jurisdiction over tax disputes consisting of claims by the Internal Revenue Service (IRS) against Chapter 11 estate and counterclaims by trustee on behalf of estate.

**[2] Bankruptcy 51 ⟜3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ⟜3784**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3784 k. Discretion. Most Cited Cases

**Bankruptcy 51 ⟜3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
        51k3785 Findings of Fact
            51k3786 k. Clear error. Most Cited Cases

    On appeal from bankruptcy court's decision in "core" proceeding, questions of law are ordinarily reviewed de novo; findings of fact, for clear error; and discretionary matters, for abuse of discretion. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

**[3] Bankruptcy 51 ⟜2123**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
            51k2123 k. Bankruptcy judges. Most Cited Cases

**Bankruptcy 51 ⟜3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and performance. Most Cited Cases

    Bankruptcy court had power, even as non-Article-III court, to enter judgment finally disposing of tax refund claims asserted by trustee of liquidating trust established under debtors' confirmed Chapter 11 plan, as counterclaims to tax, penalty, and interest claims asserted by the Internal Revenue Service (IRS), and as claims implicating "public rights" doctrine.

**[4] Federal Courts 170B ⟜1.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk1 Judicial Power of United States; Power of Congress
                170Bk1.1 k. In general. Most Cited Cases

    For purposes of the public rights doctrine, matters involving public rights are those which are susceptible of judicial power, but which Congress may or may not place within purview of Article III courts.

**[5] Constitutional Law 92 ⟜2340**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

92 Constitutional Law
   92XX Separation of Powers
      92XX(B) Legislative Powers and Functions
         92XX(B)1 In General
            92k2340 k. Nature and scope in general. Most Cited Cases

**Constitutional Law 92 ☞2620**

92 Constitutional Law
   92XX Separation of Powers
      92XX(D) Executive Powers and Functions
         92k2620 k. Nature and scope in general.
Most Cited Cases

For the most part, "public rights" doctrine extends solely to matters arising between government and persons subject to its authority in connection with performance of constitutional functions of the executive or legislative departments, and only to matters that historically could have been determined exclusively by those departments.

**[6] United States 393 ☞125(5)**

393 United States
   393IX Actions
      393k125 Liability and Consent of United States to Be Sued
         393k125(5) k. Mode and sufficiency of waiver or consent. Most Cited Cases

Sovereign immunity of the United States may be waived only by statute, and any such waiver must be unequivocally expressed.

**[7] Bankruptcy 51 ☞3570**

51 Bankruptcy
   51XIV Reorganization

51XIV(B) The Plan
      51k3570 k. Execution and performance.
Most Cited Cases

Tax refund claims asserted by trustee of liquidating trust established under debtors' confirmed Chapter 11 plan were asserted "on behalf of the bankruptcy estate," as required for bankruptcy court to be able to adjudicate claims under bankruptcy statute that dealt with determination of tax liabilities, despite contention by the Internal Revenue Service (IRS) that estate had ceased to exist once plan was confirmed, where debtors' confirmed plan specifically provided that refund claims would be transferred to liquidating trust for asserted by trustee solely on behalf of unsecured creditors. 11 U.S.C.A. § 505(a)(2)(B).

**[8] Bankruptcy 51 ☞3568(1)**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(1) k. In general. Most Cited Cases

While Chapter 11 estate ordinarily terminates upon confirmation of plan, this is only the general rule, and parties may provide otherwise in plan. 11 U.S.C.A. § 1141(b).

**[9] Bankruptcy 51 ☞2055**

51 Bankruptcy
   51I In General
      51I(C) Jurisdiction
         51k2055 k. Tax controversies. Most Cited Cases

Bankruptcy statute permitting court to determine the right of estate to tax refund for up to 120 days

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

after "the trustee" properly requests such a refund from governmental unit, or until governmental unit rules on trustee's refund request, whichever occurs sooner, is in essence a timing and exhaustion of remedies provision, that should not be interpreted as limiting bankruptcy court's ability to adjudicate tax disputes to only those brought by bankruptcy trustees. 11 U.S.C.A. § 505(a)(2)(B).

**[10]** Bankruptcy 51 ⬅3570

51 Bankruptcy
   51XIV Reorganization
     51XIV(B) The Plan
      51k3570 k. Execution and performance.
Most Cited Cases

Bankruptcy statute permitting court to determine the right of estate to tax refund for up to 120 days after "the trustee" properly requests such a refund from governmental unit, or until governmental unit rules on trustee's refund request, whichever occurs sooner, allowed court, within time limits specified, to decide tax refund claims asserted on behalf of the estate by trustee of liquidating trust established under debtors' confirmed Chapter 11 plan, though liquidating trustee was not chapter trustee. 11 U.S.C.A. § 505(a)(2)(B).

**[11]** Bankruptcy 51 ⬅2055

51 Bankruptcy
   51I In General
     51I(C) Jurisdiction
      51k2055 k. Tax controversies. Most Cited Cases

Exhaustion of administrative remedies provision of bankruptcy statute authorizing court to determine tax refund claims asserted on behalf of estate was equally applicable to refund claims asserted as counterclaims to tax, penalty, and interest claims asserted

by the Internal Revenue Service (IRS); there was nothing in exhaustion of administrative remedies provision making any exception for refund claims asserted defensively, as counterclaims to claims filed by the IRS, and while requiring exhaustion of administrative remedies in this context might lead to some inefficiencies, it would not produce absurd result. 11 U.S.C.A. § 505(a)(2)(B).

**[12]** Statutes 361 ⬅1110

361 Statutes
   361III Construction
     361III(C) Clarity and Ambiguity; Multiple Meanings
      361k1107 Absence of Ambiguity; Application of Clear or Unambiguous Statute or Language
       361k1110 k. Giving effect to statute or language; construction as written. Most Cited Cases

Statutes 361 ⬅1405

361 Statutes
   361IV Operation and Effect
     361k1402 Construction in View of Effects, Consequences, or Results
      361k1405 k. Relation to plain, literal, or clear meaning; ambiguity. Most Cited Cases

Statutory interpretation both begins and ends with statute's language when that language is clear, unless such an interpretation would lead to absurd result.

**[13]** Statutes 361 ⬅1367

361 Statutes
   361III Construction
     361III(M) Presumptions and Inferences as to Construction
      361k1366 Language
       361k1367 k. In general. Most Cited

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

Cases

   (Formerly 361k212.7)

Courts must presume that statute says what it means and means what it says.

**[14] Bankruptcy 51 🔗2055**

51 Bankruptcy
   51I In General
      51I(C) Jurisdiction
         51k2055 k. Tax controversies. Most Cited Cases

**Bankruptcy 51 🔗3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance. Most Cited Cases

**Internal Revenue 220 🔗5003**

220 Internal Revenue
   220XXVIII Refunding Taxes
      220XXVIII(B) Actions for Refunds
         220XXVIII(B)3 Conditions Precedent
            220k5002 Claim for Refund
               220k5003 k. Necessity. Most Cited Cases

Exhaustion of administrative remedies provision of bankruptcy statute authorizing court to determine tax refund claims asserted on behalf of estate, in prohibiting court from "determin[ing]" right of estate to tax refund before trustee properly files administrative request for refund, and corresponding tax statute, in providing that no such refund suit or proceeding shall be "maintained" without filing of such a request, merely prohibited refund dispute from being decided,

or refund proceeding from being allowed to continue, without exhaustion, rather than precluding commencement of refund action outright; accordingly, failure on part of trustee of liquidating trust established under debtors' confirmed Chapter 11 plan to first exhaust his administrative remedies before asserting tax refund counterclaim in bankruptcy court did not prevent trustee from curing this jurisdictional defect at later date. 11 U.S.C.A. § 505(a)(2)(B); 26 U.S.C.A. § 7422(a).

**[15] Bankruptcy 51 🔗2679**

51 Bankruptcy
   51V The Estate
      51V(G) Set-Off
         51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

**Bankruptcy 51 🔗3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance. Most Cited Cases

By belatedly filing tax refund request with Internal Revenue Service (IRS) after he had already asserted right to refund on behalf of estate as counterclaim to tax, penalty, and interest claims filed by the IRS in debtors' jointly administered Chapter 11 cases, trustee cured jurisdictional defect, and enabled bankruptcy court to proceed with adjudication of refund claim pursuant to government's express waiver of its sovereign immunity for claims asserted under bankruptcy statute that contained this exhaustion of administrative remedies provision, especially where the IRS had elected to spend both time and resources to evaluate and litigate debtor's tax liability in bankruptcy court, having filed two requests for administrative expenses by the time that trustee filed counterclaim,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

so that any argument that filing of administrative refund request earlier could have saved the IRS time and money was not particularly persuasive. 11 U.S.C.A. §§ 106(a), 505(a)(2)(B).

**[16] Bankruptcy 51 ☜2679**

51 Bankruptcy
    51V The Estate
        51V(G) Set-Off
           51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

Tax refund claim for short period of that portion of tax year remaining when debtors filed for Chapter 11 relief arose out of "same transaction or occurrence" as federal government's tax and penalty claims over this same time period, as required for government's filing of its claims to result in waiver of its sovereign immunity for tax refund claim, asserted as counterclaim to government's claims. 11 U.S.C.A. § 106(b).

**[17] Bankruptcy 51 ☜2679**

51 Bankruptcy
    51V The Estate
        51V(G) Set-Off
           51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

**Bankruptcy 51 ☜3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
           51k3570 k. Execution and performance. Most Cited Cases

In deciding whether tax refund claim asserted by trustee of liquidating trust established under debtors'

confirmed Chapter 11 plan as counterclaim to claims filed by the Internal Revenue Service (IRS) arose out of "same transaction or occurrence" as IRS's claims, as required for filing of IRS's claims to result in waiver of its sovereign immunity to trustee's counterclaim, district court would look to compulsory counterclaim jurisprudence, in which courts applied same standard of whether counterclaim arose out of "same transaction or occurrence" to determine whether it was compulsory counterclaim, as providing appropriate test for waiver-of-immunity purposes. 11 U.S.C.A. § 106(b); Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[18] Federal Civil Procedure 170A ☜776**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(C) Answer
        170AVII(C)3 Set-Offs, Counterclaims and Cross-Claims
           170Ak775 Compulsory Counterclaims
           170Ak776 k. Necessity that counterclaim arise out of same transaction or occurrence in general. Most Cited Cases

Courts take broad view of whether counterclaim arises out of the "same transaction or occurrence" as plaintiff's claim, as required for it to constitute a compulsory counterclaim, and require only that the essential facts of each claim have a logical relationship to one another, rather than an absolute identity of factual backgrounds; overarching consideration is whether the goals of judicial economy and fairness dictate that all issues should be resolved in one lawsuit. Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[19] Bankruptcy 51 ☜2679**

51 Bankruptcy
    51V The Estate
        51V(G) Set-Off

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

Mere fact that tax claims filed by federal government were rejected by bankruptcy court as untimely did not mean that government's submission to authority of bankruptcy court with respect to resolution of these claims had not resulted in waiver of its sovereign immunity as to tax refund claim arising out of "same transaction or occurrence"; waiver-of-immunity provision did not require a decision on merits of claim filed by governmental unit for government to be deemed to have waived its sovereign immunity. 11 U.S.C.A. § 106(b).

**[20] Bankruptcy 51 ⟜2679**

51 Bankruptcy
   51V The Estate
      51V(G) Set-Off
         51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

**Bankruptcy 51 ⟜3570**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3570 k. Execution and performance. Most Cited Cases

While tax refund claim asserted by trustee of liquidating trust established under debtors' confirmed Chapter 11 plan, for short period of that portion of tax year remaining when debtors filed for Chapter 11 relief, arose out of "same transaction or occurrence" as federal government's tax and penalty claims over this same time period, government, by filing request for allowance of such taxes and penalties as administrative expense of Chapter 11 estates, did not waive its sovereign immunity as to trustee's refund claim, under bankruptcy statute providing for waiver of

government's sovereign immunity by filing "proofs of claim"; in asserting administrative expense claim, government was not filing "proofs of claim." 11 U.S.C.A. § 106(b).

**[21] Bankruptcy 51 ⟜2679**

51 Bankruptcy
   51V The Estate
      51V(G) Set-Off
         51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

Government waives its sovereign immunity as to counterclaims arising out of "same transaction or occurrence" only by filing prepetition proofs of claim, not by filing application for allowance of administrative expense. 11 U.S.C.A. § 106(b).

**[22] Internal Revenue 220 ⟜3870**

220 Internal Revenue
   220V Income Taxes
      220V(N) Corporations and Stockholders
         220V(N)8 Consolidated Returns
            220k3870 k. Corporations permitted to file consolidated returns. Most Cited Cases

Once affiliated group of taxpayers files a consolidated return, group must continue to file as group, unless the Internal Revenue Service (IRS) grants permission for it to deconsolidate. 26 U.S.C.A. § 1501.

**[23] Administrative Law and Procedure 15A ⟜651**

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(A) In General

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-8**

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

15Ak651 k. In general. Most Cited Cases

**Administrative Law and Procedure 15A ☞701**

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(B) Decisions and Acts Reviewable
         15Ak701 k. In general. Most Cited Cases

Provisions of the Administrative Procedure Act (APA) barring judicial review to extent that statute precludes such review, or that agency action is committed to agency discretion by law, are construed narrowly and apply only if there is clear and convincing evidence of legislative intention to preclude review. 5 U.S.C.A. § 701(a).

**[24] Administrative Law and Procedure 15A ☞651**

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(A) In General
         15Ak651 k. In general. Most Cited Cases

Administrative Procedure Act (APA) embodies basic presumption of judicial review. 5 U.S.C.A. § 551 et seq.

**[25] Administrative Law and Procedure 15A ☞701**

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(B) Decisions and Acts Reviewable
         15Ak701 k. In general. Most Cited Cases

While Administrative Procedure Act (APA) em-

bodies basic presumption of judicial review, presumption is overcome, and reviewing court is without jurisdiction, if statute said to govern the challenged agency action is drawn so that court would have no meaningful standard against which to judge agency's exercise of its discretion. 5 U.S.C.A. § 701(a).

**[26] Internal Revenue 220 ☞4649**

220 Internal Revenue
   220XXI Assessment of Taxes
      220XXI(E) Review by Tax Court
         220k4649 k. Determinations reviewable in general. Most Cited Cases

While Congress, by enacting statute that committed matter to discretion of administrative agency in such a broad and unrestricted manner that court would have no meaningful standard against which to judge agency's exercise of its discretion, could preclude judicial review, the Internal Revenue Service (IRS), by promulgating regulation which broadly gave to the Commissioner of Internal Revenue absolute judgment as to whether to accept deconsolidated return from member of what was formerly a consolidated tax group could not insulate its decision from review under provisions of the Administrative Procedure Act (APA). 5 U.S.C.A. § 701(a); 26 U.S.C.A. § 1501; 26 C.F.R. § 1.1502–77A(d).

**[27] Internal Revenue 220 ☞4917**

220 Internal Revenue
   220XXVII Remedies for Wrongful Enforcement
      220XXVII(A) In General
         220k4917 k. Constitutional and statutory provisions; rules and regulations. Most Cited Cases

Purpose of Tax Anti-Injunction Act is to protect government's need to assess and collect taxes alleged to be due without judicial intervention, and to require that legal right to the disputed sums be determined in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

suit for refund. 26 U.S.C.A. § 7421(a).

**[28] Internal Revenue 220 ☞4920**

220 Internal Revenue
    220XXVII Remedies for Wrongful Enforcement
        220XXVII(B) Taxes and Suits Within Statutory Prohibition
            220k4920 k. In general. Most Cited Cases

Tax Anti-Injunction Act did not prohibit bankruptcy court from compelling the Internal Revenue Service (IRS) to accept a deconsolidated "stub period" return from Chapter 11 debtor that had previously been treated as member of consolidated tax group; directing the IRS to accept debtor's tax return for "stub period" between beginning of tax year and petition date did not impact on government's ability to collect taxes. 26 U.S.C.A. § 7421(a).

**[29] Internal Revenue 220 ☞3878**

220 Internal Revenue
    220V Income Taxes
        220V(N) Corporations and Stockholders
            220V(N)8 Consolidated Returns
                220k3878 k. Separate returns. Most Cited Cases

Internal Revenue Service (IRS) acted in arbitrary and capricious manner in refusing to accept deconsolidated "stub period" return from Chapter 11 debtor that had previously been treated as member of consolidated tax group with corporate parent, simply because debtor's parent, which had itself been liquidated in bankruptcy after losing millions of dollars in the months preceding its bankruptcy filing, had not filed return and the IRS could not determine whether net operating losses (NOLs) that debtor sought to carry over to stub period would be absorbed by parent; undisputed evidence established at least a prima facie case that parent had no profits during this peri-

od, and the IRS offered nothing in rebuttal. 26 U.S.C.A. § 1502.

**[30] Federal Civil Procedure 170A ☞2016**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2016 k. Reopening case for further evidence. Most Cited Cases

Application to reopen the record is committed to sound discretion of trial judge.

**[31] Bankruptcy 51 ☞3779**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3779 k. Scope of review in general. Most Cited Cases

In deciding whether bankruptcy court abused its discretion, in tax refund dispute between trustee of liquidating trust established under debtors' confirmed Chapter 11 plan and the Internal Revenue Service (IRS), in denying the IRS's motion to reopen record to present evidence of additional consideration that debtor may have received as result of sale of its business, district court would consider the following: (1) the importance and probative value of evidence; (2) the reason for IRS's failure to introduce the evidence earlier; and (3) the possibility of prejudice to trustee. 11 U.S.C.A. § 505.

**[32] Bankruptcy 51 ☞2925.1**

51 Bankruptcy
    51VII Claims
        51VII(E) Determination
            51k2925 Evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

51k2925.1 k. In general. Most Cited
Cases

**Bankruptcy 51 ☞3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and performance.
Most Cited Cases

In tax refund dispute between trustee of liquidating trust established under debtors' confirmed Chapter 11 plan and the Internal Revenue Service (IRS), bankruptcy court did not abuse its discretion in denying the IRS's motion to reopen record to present evidence of additional consideration that debtor may have received as result of sale of its business; while evidence had probative value, the IRS was well aware at time of evidentiary hearing that trustee was relying on the $1 sales price specified in sales agreement in calculating the tax owed for stub period, but provided no justification for waiting over one year after evidentiary hearing, and over four months after oral argument on evidence had concluded, to belatedly seek to introduce this evidence to prejudice of trustee, who was unable to examine drafters of agreement. 11 U.S.C.A. § 505.

**[33] Set–Off and Counterclaim 352 ☞8(1)**

–Off and Counterclaim352 Set–Off and Counterclaim
    352I Nature and Grounds of Remedy
        352k4 Grounds and Scope of Remedy
            352k8 Equitable Set–Off
                352k8(1) k. In general. Most Cited
Cases

**Set–Off and Counterclaim 352 ☞41**

–Off and Counterclaim352 Set–Off and Counterclaim
    352II Subject–Matter

352k41 k. Parties to and mutuality of cross-demands in general. Most Cited Cases

Right of setoff allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.

**[34] Set–Off and Counterclaim 352 ☞6**

–Off and Counterclaim352 Set–Off and Counterclaim
    352I Nature and Grounds of Remedy
        352k4 Grounds and Scope of Remedy
            352k6 k. Recoupment or reconvention.
Most Cited Cases

"Recoupment" involves a special subset of set-off, that applies in cases in which factual basis for claim and for setoff defense are related.

**[35] Limitation of Actions 241 ☞41**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(B) Limitations Applicable to Particular
Actions
            241k41 k. Set-offs, counterclaims, and
cross-actions. Most Cited Cases

Benefit of recoupment over setoff is that recoupment rights survive, even if defending party could not bring affirmative claim due to expiration of the applicable statute of limitations, as long as the original suit, to which recoupment is lodged as defense, is timely.

**[36] Bankruptcy 51 ☞2679**

51 Bankruptcy
    51V The Estate
        51V(G) Set–Off

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

**Bankruptcy 51 ⟳3568(2)**

51 Bankruptcy
  51XIV Reorganization
    51XIV(B) The Plan
      51k3566 Confirmation; Objections
        51k3568 Effect
          51k3568(2) k. Conclusiveness. Most Cited Cases

**Bankruptcy 51 ⟳3570**

51 Bankruptcy
  51XIV Reorganization
    51XIV(B) The Plan
      51k3570 k. Execution and performance. Most Cited Cases

Bankruptcy court was without jurisdiction, in Chapter 11 case in which Internal Revenue Service (IRS) had not filed proof of claim but only applications for allowance of administrative expenses, to enjoin the IRS, based on its failure to object to provision in debtors' confirmed Chapter 11 plan barring the exercise of setoff and recoupment rights, from future exercise of such rights against debtor; no provision of the Bankruptcy Code clearly and unequivocally waived the government's sovereign immunity with respect to enforcement of provisions of confirmed plan against governmental entity such as the IRS, as noncreditor. 11 U.S.C.A. §§ 106(a), 1141(a).

**[37] Bankruptcy 51 ⟳2679**

51 Bankruptcy
  51V The Estate
    51V(G) Set-Off
      51k2679 k. Governmental claims; immunity waiver. Most Cited Cases

**Bankruptcy 51 ⟳3343.5**

51 Bankruptcy
  51X Discharge
    51X(C) Debts and Liabilities Discharged
      51X(C)1 In General
        51k3343 Particular Debts or Liabilities
          51k3343.5 k. Taxes and assessments.
Most Cited Cases

Internal Revenue Service's (IRS's) failure to request for determination of unpaid tax liability incurred during administration of Chapter 11 case, to provide notification of any tax due within 180 days, served to discharge estate, trustee, debtors, and any successor to debtors of any liability for such tax, and barred the IRS, not only from pursuing claim for such tax, but from attempting to recover such tax by way of setoff against tax refund obligations owed to estate. 11 U.S.C.A. § 505(b)(2).

*15 Thomas P. Cole, Tax Div., CTS, Washington, DC, for Plaintiff/Appellant/Cross–Appellee.

Laurence May, Cole Schotz Meisel Forman & Leonard, P.A., New York, NY, for Defendant/Appellee/Cross–Appellant.

***CORRECTED MEMORANDUM DECISION AND ORDER***

COGAN, District Judge.

Before me is an appeal from a final order of the Bankruptcy Court for the Eastern District of New York, which incorporated four interlocutory orders. The United States (hereinafter the "IRS") challenges these interlocutory orders and the final order on eight separate grounds, most of which have sub-arguments. The Liquidating Trustee ("the Trustee") appeals on one ground. The final order of *16 the Bankruptcy Court is hereby affirmed, substantially for the reasons set forth in the four interlocutory orders and the deni-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

al of a motion for reconsideration filed by the Trustee and issued subsequent to the final order, with one exception. I conclude that the Bankruptcy Court was without jurisdiction to enjoin the IRS's future exercise of its rights to setoff and recoupment. I write here to explain my reasoning for that conclusion, as well as to clarify my reasons for affirmance on certain issues and to address issues not discussed in the Bankruptcy Court's decisions.

### BACKGROUND

This case concerns the income tax treatment of three related telecommunications entities, PT–1 Communications, Inc., PT–1 Long Distance, Inc., and PT–1 Technologies, Inc. (hereinafter "PT–1" or the "PT–1 Entities"). In 2000, WorldCom engineered a hostile takeover of both PT–1 and its parent company, the Star Group, which culminated in PT–1 and the Star Group filing for bankruptcy in 2001. WorldCom itself filed for bankruptcy in 2002. During PT–1's decade-old bankruptcy proceedings, numerous disputes have arisen with regard to PT–1's tax treatment during this tumultuous period. These disputes have now been resolved by the Bankruptcy Court and are before this Court on appeal. Roughly $16 million plus a decade of interest is at stake, with the United States seeking to recover $7 million in postpetition taxes, and the Trustee seeking to recover alleged prepetition and postpetition overpayments totaling $8.8 million.

### I. PT–1's Business

PT–1 principally performed two services, each of which allowed for phone calls to be completed through long-distance switches it either owned or had a right to use. First, it sold pre-paid calling cards. Second, it provided dial-around long distance, which allowed a telephone caller to avoid his default long-distance carrier by dialing a prefix, such as "10–10," prior to the ten-digit telephone number.

For a time, PT–1 was a successful and independent group of companies. In the mid–1990s, the three

PT–1 Entities filed their own consolidated income tax returns, with their tax year ending June 30. The exception was an eight-month return that ended February 4, 1999, because on that date PT–1 was taken over through a merger with the Star Group, a larger group of telephone industry companies. For the 1998 tax year, PT–1 paid $6.2 million in corporate income tax, some portion of which the parties agree was an overpayment arising from the carryback to this tax year of the net operating loss ("NOL") from PT–1's eight-month tax period ending February 28, 1999.

With Star's acquisition of PT–1 in 1999, PT–1 was included in the Star Group's consolidated income tax return for the periods ending December 31, 1999 (ten months) and December 31, 2000 (twelve months). Both returns report net operating losses, with the returns containing an allocation of losses to its constituent entities, including PT–1. However, a problem arose for the 2001 return. In late 2000, WorldCom had taken control of PT–1 pursuant to a stock pledge agreement with Star on which Star defaulted. Under WorldCom control, the PT–1 Entities then filed for bankruptcy in the Eastern District of New York on March 1, 2001, and later that year Star filed in the District of Delaware. However, for some undisclosed reason, neither WorldCom nor Star would include PT–1 on its consolidated return for any portion of the 2001 year. PT–1 was unaware of this fact for quite some time, due largely in part to Star's March 2002 **\*17** request for an extension of time to file its return, which extension included PT–1.

### II. PT–1's Tax Returns

The Star Group has not yet filed any type of return for any portion of 2001. The PT–1 Entities thus became self-described "tax orphans," with neither of their putative parents willing to include them on their consolidated income tax returns for the 2001 tax year or years going forward. Choosing then to file their own return, the PT–1 Entities in September 2002 filed a consolidated income tax return for the postpe-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

tition portion of 2001 (the "Short Period"), reporting tax due of $6,706,172 based on $19,160,492 in taxable income, which reflected $20,455,135 of taxable income before the application of an NOL carryforward allocated to PT–1 from the Star Group 2000 return in the amount of $1,294,643. The Short Period return was not accompanied by a request made under 11 U.S.C. § 505(b) for a prompt determination of tax.[FN1] PT–1 paid that administrative tax expense of $6.7 million with the return in the ordinary course of business as the debtor in possession. The Trustee has been attempting to recover this tax ever since on the grounds that PT–1 in fact had no tax liability for the Short Period.

> FN1. Section 505(b) provides that unless the IRS completes the examination within 180 days, the estate, the trustee, the debtor, and any successor to the debtor are discharged from any liability for additional tax later determined to be owed. *See* 11 U.S.C. § 505(b)(2). An amendment in 2005 added the "estate" to the scope of this discharge.

PT–1 did not at that time file a return for the prepetition portion of 2001—the period referred to by the parties as the "Stub Period." It did, however, file an amended return for its tax year ending June 30, 1998, seeking a refund of over $2 million as a result of NOL carrybacks from the subsequent two tax periods. The IRS did not respond to this refund request until January 27, 2004, stating that because PT–1 had not filed a tax return for the Stub Period, PT–1 might potentially have owed additional tax to the Government which could offset the refund claim amount. PT–1 then sent to the IRS two unsigned returns; one purporting to address the tax for the Stub Period, the other purporting to address the tax for the full 2001 calendar year. PT–1 also requested that the IRS deal with it on its own for the 2001 tax year because Star no longer existed, which the IRS refused to do.

For the 2002 tax year, PT–1 filed its own consol-

idated income tax return, which included a request made under Section 505(b) for a prompt determination of tax. The 2002 return included a bad-debt deduction of $21,648,496 and an NOL of $5,590, 832. The IRS examined the 2002 return, and eventually disallowed all but around $900,000 of that claimed bad-debt deduction, which converted that NOL to positive taxable income of around $14 million, with a $5.1 million tax claimed by the IRS on that income. The IRS's examination was not completed within the time allowed under Section 505(b). Instead, the IRS filed on August 1, 2006, a request for payment of administrative expense for the 2002 year in the sum of $7.8 million related to the disallowance of the bad-debt deduction.

For the 2003 tax year, PT–1 again filed its own consolidated income tax return and again included a request for a prompt determination of tax under Section 505(b). The IRS did not examine this return, and has never charged tax or filed a request for payment for the 2003 tax year. The 2003 return reported a loss of $4,062,803, **\*18** which the Trustee has sought to carry back to the 2001 Short Period.

### III. PT–1's Pre–Paid Business and its Sale

On PT–1's books, when a pre-paid calling card was sold, the proceeds of the sale were classified as deferred revenue and were not immediately recognized as income. PT–1 contended that it was not required to consider any payments as income (for tax purposes) until it rendered the service of completing the call under Generally Accepted Accounting Principles. Although the IRS disagrees, this dispute is not at issue here.

In February 2001, one month before declaring bankruptcy, PT–1 sold its pre-paid calling card business to a third party, IDT. At that time, its deferred revenue account contained $27.7 million in cash that had not yet been reported. The parties agree that as part of the sale, IDT purchased the assets of the phone card business, including inventory and all ac-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

counts receivable, and agreed to service the remaining calls for outstanding cards in circulation. However, how much the business was sold for is in dispute.

The face of the sale agreement identified a one-dollar price tag,<sup>FN2</sup> and Rosalind Gaffney, head of PT–1 tax, testified at trial to the same price. However, the agreement also required IDT to indemnify PT–1 for up to $5 million against certain then pending litigation claims. Under the agreement, if those claims were not resolved within a 120–day period, IDT would give PT–1 cash equal to 70% of the indemnity obligations, or $3.5 million. More importantly, IDT agreed to compensate PT–1 for PT–1 providing "termination services" for the cards already in circulation. IDT agreed to deposit $4 million in escrow, which was to be paid to PT–1 upon closing as a "deposit" for these future obligations.

> **FN2.** Although the sale agreement, a subsequent adversary complaint file by PT–1 against IDT, and the settlement agreement resolving this complaint were not entered into evidence at trial, the IRS subsequently moved to reopen the record approximately 1 year after the evidentiary hearing had concluded and over four months after oral argument so that the Bankruptcy Court could take judicial notice of these documents. Although the Bankruptcy Court denied this motion, it discusses the contents of the documents in one of its decisions, as do the parties. The parties further dispute the meaning of these documents. I therefore discuss them in this Decision.

In March 2001, IDT and STAR amended the agreement with IDT, causing PT–1 to execute the amendment as well. A significant change to the agreement was that IDT was no longer required to pay the indemnity or the $4 million deposit, which evidently had not been placed in escrow or paid to PT–1 upon closing of the sale as the original sales agreement had required. According to the Trustee, PT–1 performed its post-sale obligations under the contract, but IDT never paid.

PT–1 initiated an adversary proceeding against IDT in its own bankruptcy on July 25, 2002. The complaint includes claims for unpaid services rendered in excess of $10 million, the failure to pay the $5 million indemnity, and the failure to pay the escrow deposit. Further, the complaint asserts a claim for fraudulent conveyance based on the allegation that Star caused PT–1's pre-paid calling card receivables (worth about $22 million) to be transferred to IDT in exchange for assuming service obligations that would cost a fraction of the value of the receivables, while IDT simultaneously agreed to pay $9 million to Star in exchange for stock that ended up being worthless as Star soon filed for bankruptcy. The complaint also asserted that IDT and Star caused the $4 million **\*19** payment that the contract required to be paid to PT–1 to be made to Star instead.

In 2004, prior to the confirmation of the plan, the debtor in possession and IDT settled and agreed that the debtor would receive IDT common stock to be sold in installments with a guaranteed value of $14.3 million. The proceeds of that settlement were made part of the assets of the Liquidating Trust. The income tax consequences of the sale of the pre-paid business are disputed in this case, but PT–1's accounting of the sale can be described as follows.

On PT–1's 2001 proposed Stub Period return (apparently filed in 2004), it reported approximately $5.9 million in income. This figure was derived from recognizing the $27.7 million in PT–1's deferred revenue account, then subtracting approximately $22 million for the account receivables and $665,000 for the inventory it had transferred to IDT. In addition, PT–1 purportedly received $1 in consideration from IDT for the sale. The difference is a net gain of $5.9 million. However, when netting this gain with a deduction of approximately $12 million for debt that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

was allegedly uncollectible, the Trustee reported a loss for the Stub Period of over $6 million.

### IV. PT–1's Long Distance Business

PT–1's dial-around long distance business allowed long-distance callers to bypass their default long-distance carrier by using switches owned either by PT–1 or Star. A long distance caller who wanted to dial-around his default long distance provider would place a phone call using a prefix (usually "10–10"), the call would be routed to a PT–1 switch, and PT–1 would complete the call from that point forward, collecting data from its switches for billing. The PT–1 switch would collect from the dialer the local phone number from which the call was being made, the date and time of call, the duration of the call, and information about the local-exchange carrier that transmitted the call from the caller's telephone to the PT–1 switch.

PT–1 booked income using this raw information from its switches immediately upon placement of the calls. Then, because it knew nothing more than the phone number of its customers, it relied on a third-party billing intermediary to attempt to collect the PT–1's charges from the local carriers that had contracts with the callers. Each local carrier, in turn, would attempt to collect the charges for the calls by including charges on the bills that they sent to their customers.

PT–1 was paid by the billing intermediary through a two-step "true-up" process. After calls that were too short to be billed were removed, the remaining calls were deemed accepted for billing by the billing intermediary, which provided the local-exchange carriers with the billing information. The local-exchange carriers would provide an upfront payment back to the billing intermediary, which would remit that payment to PT–1, taking out a percentage for commission. In making this upfront payment, each local-exchange carrier held back a portion of the money claimed in a reserve to protect itself

from turning over to the billing intermediary more than what the local-exchange carrier could be expected to collect from the callers. Periodically, the billing intermediary would conduct a reconciliation process with each local-exchange carrier. This included so called "chargebacks," which meant that the local-exchange carrier had charged that call back to the billing intermediary if it learned that a call could not be completed or if a phone number was not correct. A second, final payment made to PT–1 reflected this true-up process. A document prepared by PT–1's accounting department provided evidence of the results **\*20** of the true-up process through the end of 2002 and was introduced into evidence by the IRS over the Trustee's objection at an evidentiary hearing held by the Bankruptcy Court in July and August 2009.

Because PT–1 reported income that it ended up not receiving at the end of the true-up process, it would claim on its tax returns bad-debt deductions. The Government concedes that this is appropriate, but challenges the substantiation that the Trustee has offered for these deductions.

### V. Proofs of Claim, Requests for Payment of Administrative Expenses, and "Counterclaims" by the Trustee

On February 4, 2004 (one week after disallowing PT–1's refund request for overpaid taxes from 1998), the IRS filed its first prepetition proof of claim and postpetition request for administrative tax expenses that are relevant to the disputes at issue here. The claims were for approximately $35 million and consisted of a demand for taxes, penalties, and interest for the two-month prepetition Stub Period, penalties and interest for the postpetition Short Period, and penalties and interest for 2002 (also clearly postpetition).

On August 10, 2004, the IRS amended the February 4, 2004, claim, withdrawing its claim for prepetition Stub Period taxes. The amended proof of claim

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

still contained a request for administrative expenses for Short Period penalties of $1,628,582.11 and interest on the penalties of $436,277.97.

On March 14, 2005, the Trustee filed a motion to disallow the IRS's requests for administrative expense payments. The Trustee also sought a declaration that PT–1 was permitted to file a tax return for PT–1 and its subsidiaries for the Stub Period. Additionally, the Trustee sought to carry forward and carry back NOLs against the taxable income for the Short Period; to recover a tax refund of $2,178,891 for the tax period that ended June 30, 1998 plus interest; and to recover a refund of the $6,913,228.53 paid with the Short Period tax return. PT–1 had previously requested a tax refund from the IRS for the 1998 tax year, but had not requested a refund for the Short Period at the time it filed this motion. It did, however, file what it called a "protective" refund with the IRS in September 2005, which it attached to its second motion for summary judgment, filed in September 2007.

On March 17, 2005, the IRS filed another request, this time seeking unpaid taxes from the Short Period in the amount of $453,125 in addition to penalties and interest totaling approximately $200,000. This claim was filed after plan confirmation and appointment of the Trustee.

Finally, by request for administrative expenses filed August 1, 2006, the IRS dropped its demand for penalties with respect to the alleged Short Period tax, but added a new penalty request of $260,207.25 and interest on the penalty of $209,789.29. The IRS also requested $7.8 million in tax, interest on tax, and penalties based on its disallowance of all but $900,000 of PT–1's $21 million bad-debt deduction for the 2002 tax period.

**VI. Bankruptcy Court Decisions**

The Bankruptcy Court issued four decisions, a

final order, and an order denying the Trustee's motion for partial reconsideration.

**1) Decision I: 357 B.R. 217, issued December 7, 2006**

In Decision I, the Bankruptcy Court expunged the IRS proof of claim, as amended, which sought payment of administrative taxes of $7.8 million for the 2002 tax year. The Bankruptcy Court held that the debtor had made a proper request for **\*21** an expedited determination of tax liability for that year pursuant to Bankruptcy Code § 505(b)(2), and because the IRS did not act timely to examine the return, the debtor and the Liquidating Trust were discharged of all tax liabilities not reflected on the 2002 return.

**2) Decision II: 386 B.R. 402, issued March 26, 2007**

In Decision II, the Bankruptcy Court disallowed the IRS's administrative claim for three kinds of penalties related to $6.7 million in tax reported and paid for the 2001 Short Period. Regarding that portion of the IRS's February 4, 2004 claim, as amended on August 30, 2004, which sought penalties and interest based upon the debtor's purported failure to timely file the Short Period return, the Bankruptcy Court noted that the IRS had withdrawn this claim. Regarding the IRS's August 1, 2006, request for penalties for the Debtors' alleged failure to pay estimated taxes for the Short Period, the Bankruptcy Court held these to be time-barred given their filing after the administrative bar date.

**3) Decision III: 403 B.R. 250, issued March 31, 2009**

Decision III granted the Trustee's request for summary judgment on one of his two "counter-claims" for a refund of $2,178,891 for taxes paid for the tax year ending on June 30, 1998. It also expunged that portion of the IRS's requests that sought taxes and interest for the Short Period, and which had not been expunged in Decision II.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

In so holding, the Bankruptcy Court made the following rulings: (a) it disallowed the IRS's administrative tax claim for the 2001 Short Period on the grounds that the IRS's request for payment under § 503(b) was not filed by the administrative claims bar date; (b) it rejected the IRS's arguments that sovereign immunity barred the refund suit; (c) it ruled that filing a claim for refund with the IRS was not required where the refund claim is a counterclaim to a proof of claim filed in a bankruptcy case and the claims arose from the same transaction; (d) it rejected the IRS's contention that the Tax Anti–Injunction Act barred it from directing the IRS to accept an income tax return for the 2001 Stub Period that addressed the income and expense items only of the PT–1 Entities; (e) it ruled that the APA allowed it to order the IRS to accept a deconsolidated income tax return of PT–1 for the 2001 Stub Period; (f) it held that the IRS's failure to object to the anti-setoff and anti-recoupment provisions of the plan prior to confirmation bound it to the injunction in the confirmation order; (g) it granted the Liquidating Trustee's refund claim for 1998 in the amount of $2,178,891 based on a carryback of PT–1's allocable portion of the Star Group loss in 1999; and (h) it ruled that an evidentiary hearing was needed to determine PT–1's NOLs from the other years without which the Trustee would not be entitled to its claimed refund for the 2001 Short Period.

**4) Decision IV: 447 B.R. 115, issued March 3, 2011**

The Bankruptcy Court issued Decision IV on March 3, 2011, following a three-day evidentiary hearing and two rounds of post-trial briefs and oral arguments. The Bankruptcy Court held that: (a) an undisputed NOL allocable to the PT–1 Entities from the Star Group's 2000 income tax return (in the amount of $7,423,328.00) could be applied toward taxable income of the PT–1 Entities for the postpetition portion of the 2001 year, after passing through the 2001 Stub Period; (b) it held that the approximately $27.7 million in deferred revenue had to be

recognized upon **\*22** the sale of PT–1's pre-paid calling card business as argued by the IRS, but held this was offset by an approximately $22 million loss on that sale; (c) it sustained a deduction reported on PT–1's proffered return for the 2001 Stub Period in the amount of $11,868,413 that allegedly related to bad debts written off in connection with the same sale of the pre-paid phone-card business; (d) it denied the IRS's motion to reopen the evidentiary record to take judicial notice of PT–1's adversary complaint against IDT and the settlement agreement; (e) it allowed deductions related to operational long-distance bad debt of $3,892,212.42 for the 2001 Stub Period, $10,656,606 for the 2001 Short Period, and $8,133,202.04 for the 2002 tax year; (f) it denied claimed long-distance bad-debt deductions in the amounts of $2,353,526 for the 2001 Stub Period, $12,467,028 for the 2002 tax year, and the entire $5,470,721 reported for the 2003 tax year.

**5) Final Order, issued April 29, 2011**

The final order specified the particular relief appropriate under the four prior decisions and provided for: (a) the recovery of an overpayment of $2,178,891 for the 1998 year (based on a loss carried back from 1999); (b) the recovery of an overpayment of $3,806,512 for the 2001 Short Period (based on losses carried forward from 2000 and the 2001 Stub Period); and (c) an injunction directing the IRS to accept a deconsolidated income tax return reporting the income tax liability of the PT–1 Entities for the 2001 Stub Period. It also disallowed the IRS's administrative tax claims and enjoined the Government from exercising any setoff or recoupment rights.

**6) Motion for Reconsideration Denial, issued September 28, 2011**

The Trustee moved for reconsideration of the disallowance of an approximately $5.5 million bad-debt deduction from its 2003 tax year on the ground that it did not have sufficient notice from the joint pretrial order that this would be at issue during the trial, and that the Bankruptcy Court failed to apply

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567**
**(Cite as: 486 B.R. 9)**

the appropriate burden-shifting standard on disputes over deductions. The Court denied the motion, explaining in detail why the Trustee had sufficient notice and why the Trustee had failed to sustain its burden on the deductions.

### DISCUSSION

As noted above, the IRS challenges eight rulings by the Bankruptcy Court on appeal, and the Liquidating Trustee challenges one ruling. For three of the IRS's challenges and the one ruling appealed by the Trustee, I affirm the holdings of the Bankruptcy Court for the reasons stated in the respective decision. For the remaining challenges, I write to explain my agreement and disagreement with the Bankruptcy Court's orders, and address those issues not before it.

**I. Standard of Review**

[1] A threshold issue disputed by the parties concerns the standard of review this Court must apply in evaluating the Bankruptcy Court's determinations. The tax disputes at issue here consist of claims against the estate, and, as explained in greater detail below, counterclaims by the Trustee on behalf of the estate. Accordingly, the matters before the Bankruptcy Court are core proceedings under 28 U.S.C. § 157(b).

[2] As a core proceeding, questions of law are ordinarily reviewed *de novo,* findings of fact will not be set aside unless clearly erroneous, and discretionary matters, such as the denial of a motion to reopen the evidentiary record, are reviewed**\*23** for abuse of discretion. *See Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros., LLP),* 673 F.3d 180, 186 (2d Cir.2012); *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir.2006); *Mendelsohn v. Port Auth. Trans–Hudson Corp.,* No. 11–cv–03820, 2012 WL 3234107, at \*5, 2012 U.S. Dist. LEXIS 110276, at \*14 (E.D.N.Y. Aug. 3, 2012). Nevertheless, the IRS contends that as a result of the Supreme Court's holding in *Stern v. Marshall,* ––– U.S. ––––, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), even if the proceeding

is core, this Court must review all aspects of the Bankruptcy Court's decisions *de novo.*

The issue before the Supreme Court in *Stern* was whether the bankruptcy court could constitutionally enter a final order on a counterclaim based upon a common law cause of action. The Supreme Court recognized that Congress granted that right to bankruptcy courts when it enacted 28 U.S.C. § 157(b), and that the subsections of this statute provide that a bankruptcy court may hear and determine 16 different types of matters, including counterclaims "by the estate against persons filing claims against the estate." *Stern,* 131 S.Ct. at 2603. The Supreme Court held, however, that with respect to common law counterclaims, Congress could not constitutionally grant a non-Article III court the authority to exercise the judicial authority of the United States through entry of final orders. *Id.* at 2609, 2611, 2614–15.

[3] The Trustee contends first that *Stern* should be read to only apply to common law causes of action, and that because its refund claims here are not, *Stern* does not require *de novo* review by this Court. I need not address whether this narrow reading of *Stern* passes muster, however, as the Trustee's second argument—that its refund claims fall under the public rights doctrine and therefore can be finally adjudicated by an Article I court—is clearly correct. In *Stern,* the Supreme Court recognized the long history of the public rights doctrine in federal jurisprudence, which dates back to *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 18 How. 272, 15 L.Ed. 372 (1856). Although the public rights doctrine has not been well-defined or treated consistently throughout history, *see Stern,* 131 S.Ct. at 2611, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 69, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the doctrine can nonetheless be described as follows.

[4][5] Matters involving public rights are those which are susceptible of judicial power but which

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

Congress may or may not place within the purview of Article III courts. *See Stern,* 131 S.Ct. at 2612. This doctrine is in part explained by principles of sovereign immunity, and in part based on the recognition that certain matters have been historically reserved to the political branches of Government. Thus, for the most part, the public rights doctrine extends only to matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and only to matters that historically could have been determined exclusively by those departments, *see Ex parte Bakelite Corp.,* 279 U.S. 438, 458, 49 S.Ct. 411, 73 L.Ed. 789 (1929). The logic of these decisions is that the Framers expected that Congress would be free to commit such matters completely to non-judicial executive or legislative determination, "and that as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative**24** agency." *Northern Pipeline,* 458 U.S. at 68, 102 S.Ct. 2858.

Applying this framework to the instant action, several factors establish that these tax disputes fall under the public rights doctrine. First, the Trustee's refund suit against the IRS fits squarely within the definition of a public right set forth in *Crowell* and reaffirmed in *Stern.* That is, the suit is between the United States Government and a party subject to the Government's authority, and it concerns the performance of the constitutional functions of the executive branch, *i.e.,* tax collection. Moreover, this action was only possible as a result of the Government's waiver of sovereign immunity under 11 U.S.C. § 106. It is not surprising, therefore, that a leading constitutional scholar has referenced Article I Tax Courts as deriving their legitimacy from the public rights doctrine.[FN3]

FN3. *See* Erwin Chemerinsky, *Formalism Without a Foundation: Stern v. Marshall,* Univ. Of Cal. Irvine School of Law Legal Studies Research Paper Series No. 2011–51 (Nov. 27, 2011, forthcoming in Supreme Court Review), *available at* papers.ssrn.com/sol3/papers.cfm?abstract_id=1965604.

This conclusion is also consistent with the Framers' original understanding of the public rights doctrine as it applies to tax matters. Since the founding of our nation and up until the Civil War, the Federal Government relied primarily on customs duties to finance its activities rather than a national taxation system.[FN4] In the very first Congress, controversies surrounding customs duties were excluded from Article III Courts and instead placed under the purview of the Treasury Department. *See* Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III,* 101 Harv. L. Rev. 915 (Mar. 1998). Thus, the Framers' intent and original understanding of Article III was that disputes regarding revenue collection by the Federal Government could be committed to non-judicial resolution.

FN4. *See* Executive Office of the President of the United States, *The Budget for Fiscal Year 2012, Historical Tables, available at* www. whitehouse. gov/ sites/ default/ files/ omb/ budget/ fy 2012/ assets/ hist. pdf.

The Supreme Court has agreed. One of the original decisions to address public rights, *Crowell,* "attempted to catalogue some of the matters" that fall within the doctrine. *Northern Pipeline,* 458 U.S. at 70 n. 22, 102 S.Ct. 2858. Among the various examples cited by the Court in *Crowell* are "administrative agencies created for the determination of such matters" as interstate and foreign commerce, immigration, and taxation. *See Crowell,* 285 U.S. at 51, 52 S.Ct. 285. Thus, since 1932, the Supreme Court has recognized disputes over taxation as concerning pub-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

lic rights.

Finally, I note that tax disputes have already been committed to the jurisdiction of the United States Tax Court and the Federal Court of Claims which, like the Bankruptcy Court, are Article I tribunals. The decisions of these courts are reviewed under ordinary appellate standards, *i.e.*, legal determinations are reviewed *de novo*, but factual findings are reviewed for clear error. *See Robinson Knife Mfg. Co. v. Comm'r*, 600 F.3d 121, 124 (2d Cir.2010) (noting standard of review regarding Tax Court); *Okerlund v. United States*, 365 F.3d 1044, 1049 (Fed.Cir.2004) (same regarding Federal Court of Claims). The Trustee contends that this establishes that tax disputes fall under the public rights doctrine, while the IRS responds that a taxpayer's option to file a refund request in an Article III court suggests the opposite. Although I find that the jurisdiction of Article I Courts over tax disputes is not dispositive of the issue as it does not completely*25 remove tax disputes from Article III tribunals, the Trustee nevertheless has the better argument here.

In the division of authority between Article I courts on the one hand and Article III district courts on the other, the key distinction as it applies to this case is that the choice of forum belongs to the taxpayer, not the IRS. A taxpayer may pay the tax allegedly owed and sue for a refund in either a district court or the Federal Court of Claims, *see* 28 U.S.C. § 1346, or it may bring the action in Tax Court before paying the tax, *see Samuels, Kramer & Co. v. Comm'r*, 930 F.2d 975, 979 (2d Cir.1991). In either case, the IRS has no constitutional right to adjudication by an Article III court, other than on appeal. This provides strong support for the conclusion that because the Trustee elected to file its refund claim in the Bankruptcy Court, that Court's final decisions are constitutional, and are to be reviewed under the usual appellate standards.

Accordingly, I will review questions of law *de*

*novo*, findings of fact for clear error, and discretionary matters for an abuse of discretion.

**II. Sovereign Immunity and Jurisdiction Over Tax Refund Claims**

[6] "In any suit in which the United States is a defendant, there must be a cause of action, subject matter jurisdiction, and a waiver of sovereign immunity." *Presidential Gardens Assocs. v. U.S. ex. rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir.1999). The sovereign immunity of the United States may only be waived by statute, *see id.*, and must be "unequivocally expressed." *Diaz v. United States*, 517 F.3d 608, 611 (2d Cir.2008). Section 106 of Title 11 is just such a statute, expressly abrogating sovereign immunity both with respect to proceedings under various provisions of the Bankruptcy Code, *see id.* at § 106(a), and for claims that are property of the estate and arise out of the same transaction or occurrence as a proof of claim filed by a Governmental unit in the bankruptcy proceeding, *see id.* at § 106(b). The Bankruptcy Court relied on each of these subsections in concluding that the IRS had waived sovereign immunity with regard to tax claims filed by the Trustee. For the reasons stated below, I agree with the Bankruptcy Court that Section 106(a) applies in this case. However, I do not agree that Section 106(b) applies.

**1) Section 106(a)**

The Bankruptcy Court held that the IRS waived sovereign immunity under Section 106(a) by concluding that the tax disputes at issue before it fell under 11 U.S.C. § 505, a statute specifically designated in subsection (a) of Section 106. Section 505(a) empowers bankruptcy courts to resolve disputes with taxing authorities. The IRS contends that this decision was error because 11 U.S.C. § 505(a)(2) limits the application of Section 505(a) to tax refund claims brought by a "bankruptcy trustee" on behalf of a "bankruptcy estate" after a properly filed refund request. However, according to the IRS, the liquidating trust is not a bankruptcy estate, the Trustee is not a

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

bankruptcy trustee, and the Trustee failed to properly file a refund request. I am not persuaded by these arguments.

### a. Brought on behalf of a bankruptcy estate

[7][8] As an initial matter, I do not accept the IRS's contention that the tax refund claims at issue here are not property of the estate because the estate necessarily ceased to exist upon confirmation of the plan. Section 1141 of Title 11 and the cases cited by the IRS in support of this argument undoubtedly stand for the proposition that a bankruptcy estate ordinarily **\*26** terminates upon plan confirmation. However, Section 1141 also explicitly states that this is the general rule "except as otherwise provided in the plan." *See* 11 U.S.C. § 1141(b); *see also Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n,* 997 F.2d 581, 587 (9th Cir.1993). Pursuant to 11 U.S.C. § 1123(b), the plan at issue here specifically provided that the claims belonging to the debtor would be transferred to the liquidating trust to be asserted by the Trustee. Further, the Trustee is charged with asserting claims solely on behalf of the unsecured creditors of the debtor, and was forced to defend claims by the IRS for tax obligations allegedly incurred by the debtor in possession after PT–1 filed for bankruptcy. I therefore conclude, as numerous courts have, that the Trustee represents the remainder of the estate in this claims process. *See, e.g., Gordon Sel–Way, Inc. v. United States,* 270 F.3d 280, 286 (6th Cir.2001) (although relying in part on logic enumerated in a Chapter 13 case, holding that "where the debtor does not obtain a discharge and post-confirmation property is committed to the plan of reorganization, it would be arbitrary to exclude [post-confirmation] property from the property of the estate"); *Guttman v. Martin (In re Railworks Corp.),* 325 B.R. 709, 719 (Bankr.D.Md.2005) (recognizing that "although normally the estate would terminate after confirmation, 11 U.S.C. § 1123(b)(3) expressly allows the estate to exist with respect to those claims that are preserved by the plan, and the vestige of the estate exists in the representative, who takes on a

capacity similar to that of a trustee."); *Schroeder v. United States (In re Van Dyke),* 275 B.R. 854, 859 (Bankr.C.D.Ill.2002) (holding that the liquidating agent's tax claims are brought on behalf of the estate because any recovery he makes will inure to the benefit of the debtor's unsecured creditors under the confirmed plan). Accordingly, the Trustee's refund claims are brought on behalf of the estate.

### b. Brought by a bankruptcy trustee

[9][10] The IRS next argues that any and all refund claims brought in a bankruptcy court must be brought by a bankruptcy trustee (or a debtor in possession). However, Section 505 is not by its own terms expressly limited to such actions. Rather, the jurisdictional grant of that Section uses broad language, stating that "the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." 11 U.S.C. § 505(a)(1). Section 505(a)(2), in turn, provides various limitations to this broad scope, including the limitation set forth in subsection (a)(2)(B), on which the IRS relies. However, this limitation, which prevents a bankruptcy court from determining the right of a debtor to a tax refund before the earlier of 120 days after the "trustee" requests such a refund or a determination is made regarding such request, is in essence a timing and exhaustion of remedies provision. *See IRS v. Luongo,* 259 F.3d 323, 330 (5th Cir.2001) (noting that the purpose of subsection (a)(2)(B) was to "prevent a refund claim from languishing in the administrative process"); *see also* 11 U.S.C. 505(a)(2)(B) (prefacing that subsection by stating that a bankruptcy court may not determine "any right of the estate to a tax refund, *before the earlier of ...*") (emphasis added). It does not limit the bankruptcy court's ability to adjudicate tax disputes to only those brought by bankruptcy trustees.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

If Congress had wanted to limit the right to bring refund claims in bankruptcy *27 court solely to bankruptcy trustees, it could have, and would have, done so expressly. It did just that in the same section of Title 11, stating in Section 505(b)(2) that "[a] trustee may request a determination of any unpaid liability of the estate for any tax incurred during the administration of the case" by following a particular procedure. The absence of such language in Section 505(a)(2)(B) is telling, and distinguishes this case from _Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000),_ on which the IRS also relies.

This conclusion is further supported by the legislative history of Section 505, which provides a strong indication that it was not intended to be limited to refund requests brought solely by bankruptcy trustees. As an initial matter, Representative Don Edwards of California [FN5] emphasized the broad scope of Section 505, stating that it "authorizes the bankruptcy court to rule on the merits of any tax claim involving an unpaid tax, fine, or penalty relating to a tax, or any addition to a tax, of the debtor or the estate." _See_ 124 Cong. Rec. H 11110 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards introducing the House amendments), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6490. Although this statement expressly refers to unpaid taxes, it establishes that Congress's concern when enacting Section 505 was to enable bankruptcy courts to resolve tax disputes of the "debtor or the estate." As noted above, the refund claims brought by the Trustee here are for the benefit of the estate.

FN5. The Supreme Court has explicitly relied on the comments of Representative Edwards "as persuasive evidence of congressional intent" with regard to the Bankruptcy Reform Act of 1978, in light of the key role played by Edwards and the lack of a conference. _See Begier v. IRS, 496 U.S. 53, 64 n. 5, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)._

Second, although Representative Edwards's brief discussion of refund claims under Section 505(a)(2)(B) refers to claims brought by a "trustee," nothing in his statements indicate that the use of that term had any significance other than to express the general expectation, just noted, that the refund claim would benefit the estate. _See Luongo, 259 F.3d at 343_ (Garza, J. dissenting) (quoting Representative Edwards's comments on Section 505(a)(2)(B) and concluding that the use of the term "trustee" indicates that refund claims were intended to benefit the estate). Instead, his statements make clear that the focus and purpose when enacting Section 505(a)(2)(B) was to ensure that, in ordinary circumstances, a tax refund claim was filed with the IRS prior to the filing of a tax refund claim in the bankruptcy court. I therefore conclude that the legislative history of Section 505 undermines any argument that the use of the word trustee in Section 505(a)(2)(B) was intended to limit tax refund claims to those commenced by such a party.

Finally, I find support for this conclusion in the fact that every decision cited by the parties that addresses the restrictive interpretation of Section 505 offered by the IRS here has rejected that position. _See Luongo, 259 F.3d at 328–29; Gordon, 270 F.3d at 284–85; Van Dyke, 275 B.R. at 858–59._ Notwithstanding the IRS's attempt to distinguish these cases on their facts or to criticize their reasoning, the uniformity of interpretation of Section 505 confirms that the tax refund claims brought by the Trustee fall under Section 505.

**c. After a properly filed refund request**

Finally, the IRS contends that the Trustee failed to comply with *28 Section 505(a)(2)(B) by not properly filing a refund request with the IRS prior to filing its claims in the Bankruptcy Court. Courts have uniformly recognized that the use of the phrase "properly filed" in that subsection incorporates 26 U.S.C. § 7422(a). _See, e.g., United States v. Kearns,_

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

177 F.3d 706, 710 (8th Cir.1999); *In re Rodriguez,* 387 B.R. 76, 89 (Bankr.E.D.N.Y.2008); *In re Dunhill Medical, Inc.,* No. 92–37700, 1996 WL 354696, at *5, 1996 Bankr.LEXIS 435, at *13 (Bankr.D.N.J. Mar. 27, 1996). 26 U.S.C. § 7422(a) provides:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

The parties agree that the Trustee failed to file this request prior to filing its refund claim. Instead, in September 2005, approximately six months after filings its refund claim in the Bankruptcy Court, the Trustee filed with the IRS what it termed a "protective" refund claim for the 2001 Short Period. The Trustee attached this refund request to its second motion for summary judgment filed with the Bankruptcy Court in September 2007. According to the IRS, the Trustee's failure to exhaust administrative remedies prior to filing suit deprived the Bankruptcy Court of jurisdiction to hear the Trustee's Short Period refund claim.[FN6]

> FN6. PT–1 had already filed a refund request for 1998, thus removing that claim from this objection by the IRS.

[11][12] In response to this argument, the Bankruptcy Court relied on a line of cases holding that the requirement that a party first file a refund request with the IRS does not apply when the refund suit is filed in the bankruptcy court as a counterclaim. *See In re PT–1,* 403 B.R. 250, 263 (Bankr.E.D.N.Y.2009)

(citing *Kearns,* 177 F.3d at 711; *In re Rodriguez,* 387 B.R. at 89; *United States v. Henderson (In re Guardian Trust Co.),* 260 B.R. 404, 414 (S.D.Miss.2000); *In re Dunhill,* 1996 WL 354696, at *5, 1996 Bankr.LEXIS 435, at *13–14). These decisions in turn rely on the statement of Representative Edwards that "if the refund results from an offset or counterclaim ... the trustee would not first have to file an administrative claim for a refund with the tax authority," as well as general concerns of efficiency and practicality. *See, e.g., Kearns,* 177 F.3d at 711; *In re Rodriguez,* 387 B.R. at 89. However, statutory interpretation both begins and ends with the statute's language when that language is clear, unless such an interpretation would lead to an absurd result. *See Lamie v. United States Tr.,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *ASM Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.),* 582 F.3d 422, 427 (2d Cir.2009). In this case, Section 505(a)(2)(B) unequivocally states that bankruptcy courts may not determine the right of the estate to a tax refund until after the trustee "properly requests such refund." This language requires exactly what it says—that the trustee files a proper request for a refund with the IRS before a bankruptcy court may determine the right to a refund. Further, the purpose of this provision is undoubtedly to **\*29** ensure that the IRS has the opportunity to consider refund claims before having to litigate them in court. Although, in the case of counterclaims, such a requirement is arguably inefficient, it is by no means absurd.

[13] Accordingly, I cannot consider Representative Edwards's statements regarding a potential exception to the exhaustion of remedies requirements found in Sections 505(a)(2)(B) and 7422(a). Courts must presume that a statute says what it means and means what it says. *See BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004). If Congress truly intended there to be such an exception, it would have included it in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

the statute. The Trustee therefore was required to exhaust administrative remedies in this case. *See Graham v. United States (In re Graham), 981 F.2d 1135, 1138 (10th Cir.1992)* (analyzing Sections 505(a)(2)(B) and 7422(a) and concluding "[s]imply put, no claim, no refund").

In light of the Trustee's failure to exhaust, The IRS contends that the Trustee's only remedy is to bring an original action against the IRS in this Court, which may or may not be barred by the statute of limitations. In support, it cites *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States,* 86 Fed.Cl. 518 (2009), which held that federal courts are without jurisdiction to hear refund suits when a taxpayer failed to exhaust administrative remedies prior to filing suit. *See id. at 548 n. 55.* In the alternative, the IRS suggests that this Court consider the late-filed refund request as a supplement or amendment to the original filing. For the following reasons, I conclude that the Trustee's failure to file a request with the IRS prior to filing its claim is not an absolute jurisdictional bar. Additionally, I find that the Trustee's filing of its request with the Bankruptcy Court in 2007 amounted to an amendment of, or supplement to, its initial pleading, and that the Trustee's filing of its refund claim with the IRS was sufficient to exhaust administrative remedies.

[14] As an initial matter, Section 505(a)(2) provides that a bankruptcy court "may not so determine" the right of an estate to a tax refund before the trustee properly files a refund request. Section 7422(a), in turn, provides that no suit or proceeding shall be "maintained" without first filing such a request. The use of the phrases "determine" and "maintained" is important here, as it indicates that a dispute may not be decided and the proceeding shall not be allowed to continue without exhaustion, rather than precluding the commencement of the action outright.[FN7] I therefore reject the contention that purely by filing its refund claim first, the Trustee was barred from asserting a claim in the Bankruptcy Court and could not

later cure the jurisdictional defect. *See Black v. Sec'y of Health & Human Servs.,* 93 F.3d 781, 790 (Fed.Cir.1996) (distinguishing **\*30** statutes that expressly bar filing suit before exhaustion with those that preclude judicial review, and noting that amendment is allowed in the latter). Several courts throughout the country have permitted such or similar amendments. *See United States v. Klohn,* No. 3:06–cv–222–J, 2009 WL 536520, at \*1–2 n. 5, 2009 U.S. Dist. LEXIS 20486, at \*4 n. 5 (M.D.Fla. Mar. 3, 2009); *Whittington v. United States,* 380 F.Supp.2d 806, 813 (S.D.Tex.2005) (allowing plaintiff to amend complaint despite filing of suit without first exhausting administrative remedies by allowing six-month waiting period under 26 U.S.C. § 6532 to expire); *Provenzano v. United States,* 123 F.Supp.2d 554, 558 (S.D.Cal. Aug. 30, 2000); *Tobin v. Troutman,* No. 3:98CV–663–H, 2002 WL 768677, at \*6–7, 2002 U.S. Dist. LEXIS 7105, at \*17–20 (W.D.Ky. Apr. 19, 2002) (explaining why amendment should be allowed even though Section 6532 bars filing of suit).

FN7. Although the heading of subsection (a) of Section 7422 states "[n]o suit prior to filing claim for refund," titles of statutes and headings of sections are only available to "shed light on some ambiguous word or phrase in the statute itself." *See Whitman v. Amer. Trucking Ass'ns,* 531 U.S. 457, 483, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *Almendarez–Torres v. United States,* 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); *Cenzon–DeCarlo v. Mount Sinai Hosp.,* 626 F.3d 695, 697 (2d Cir.2010). However, the IRS relies on the phrase maintained to support its position, and does not contend that the use of "filing" in the title sheds light on an ambiguous word or phrase. To the contrary, I find that maintained is clear, and has a meaning that is distinct from filing. In any event, I find that an amendment is proper based on the facts of this case and the reasoning of the district court cases,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

both noted below.

[15] Further, the rather compelling facts of this case provide strong support for the conclusion that the Trustee should be considered to have cured the jurisdictional defect here. The IRS had undoubtedly elected to spend both time and resources to evaluate and litigate PT–1's tax liability, having filed two requests for administrative expenses for the Short Period by the time the Trustee filed its counterclaim, and one request just three days after. Thus, the United States had already elected to commit litigation resources to this case, and the argument that the filing of a refund request could have saved it time and money is not particularly persuasive. *See Kearns, 177 F.3d at 711; Michaud v. United States, 206 B.R. 1, 8 (D.N.H.1997).* This is especially true in light of the fact that the Trustee filed its refund request less than six months after it filed its claim in the Bankruptcy Court, did not move for summary judgment until September 2007 (two years later), and the Bankruptcy Court did not decide the dispute until March 31, 2009. Had the IRS wanted to avoid the costs of litigation and issue the refund, it had plenty of time to do so. It did not, and the record is clear why: since 2004, the Government in this case, and the IRS in its dealings with the Trustee, have taken the position that the absence of a Stub Period return from the Star Group precludes PT–1 from any refund, whether it be from 1998 or the 2001 Short Period. The filing of a refund request fell on deaf ears as a result.

Finally, I note that although the Trustee filed its refund request in September 2005, the Court cannot find any evidence that the IRS challenged the Bankruptcy Court's jurisdiction based on exhaustion of remedies until the Trustee moved for summary judgment in September 2007. Had the IRS objected earlier, the Trustee could easily have amended its claim. I therefore will not penalize the Trustee for not filing until September 2007 the refund request it submitted to the IRS in September 2005.

**2) Section 106(b)**

The Bankruptcy Court held in the alternative that the IRS waived sovereign immunity regarding the Trustee's claims for tax refunds under Section 106(b) by filing a claim against the Trustee for unpaid taxes and penalties from the Short Period. Section 106(b) provides that "[a] governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." 11 U.S.C. § 106(b). The Government challenges this conclusion by: 1) noting that Section 106(b) is limited to claims that are property of the estate, and *31 repeating its argument that the bankruptcy estate here necessarily ceased to exist upon plan confirmation; 2) contending that the Trustee's refund claims are not counterclaims because they did not arise from the same transaction or occurrence as the IRS's claim for Short Period penalties; 3) asserting that the Trustee's claims are not counterclaims because the IRS's claims were rejected as untimely; and 4) contending that because Section 106(b) is limited to counterclaims to proofs of claim, the IRS's filing of administrative claims cannot amount to a waiver of sovereign immunity. I address each of these arguments in turn below, except the first, which I have already rejected.

**a. Same transaction or occurrence**

[16][17] As noted above, Section 106(b) waives sovereign immunity only for counterclaims that arise out of the same transaction or occurrence as the Government's claims. This language mirrors that of Federal Rule of Civil Procedure 13(a), which defines compulsory counterclaims in ordinary civil litigation. Accordingly, numerous courts considering the scope of the waiver of sovereign immunity under Section 106(b) have relied on compulsory counterclaim jurisprudence under Rule 13. *See, e.g., Gordon, 270 F.3d at 287; In re Univ. Med. Ctr., 973 F.2d 1065, 1086 (3rd Cir.1992); WJM, Inc. v. Mass. Dep't of Pub.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

*Welfare,* 840 F.2d 996, 1005 (1st Cir.1988); *United States Lines (S.A.) v. United States (In re McLean Indus.),* 162 B.R. 410, 417 (S.D.N.Y.1993); *see also Ossen v. Dep't of Soc. Servs. (In re Charter Oak Assocs.),* 361 F.3d 760, 768 (2d Cir.2004) (noting that most circuits agree that when a state files a proof of claim, it waives immunity to compulsory counterclaims, referencing Rule 13(a)). I therefore do so here as well.

[18] The Second Circuit has traditionally taken a "broad view" of the same transaction test under Rule 13. *See United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979). To be considered part of the same transaction or occurrence, the essential facts of each claim need only have a logical relationship to one another, rather than "an absolute identity of factual backgrounds." *See Jones v. Ford Motor Credit Co.,* 358 F.3d 205, 209 (2d Cir.2004); *Aquavella,* 615 F.2d at 22. The overarching consideration under this test is whether the goals of judicial economy and fairness dictate that all the issues should be resolved in one lawsuit. *See Jones,* 358 F.3d at 209; *Aquavella,* 615 F.2d at 22.

Applying this standard here, I conclude that the Trustee's claim for a Short Period refund is sufficiently related to the IRS's claims to fall under the ambit of 11 U.S.C. § 106(b). Beginning with the IRS's claim for Short Period penalties, those penalties surely were derived in part from the amount of tax allegedly owed by PT–1 (and the Trustee as successor) for that period. Thus, PT–1 had one available defense to the IRS's claim that it did not in fact owe the underlying tax to begin with, but rather was owed a refund by the IRS. This would necessarily involve, as the Bankruptcy Court held, "the disallowance of NOLs, which is the basis of the IRS's Short Period Request." *In re PT–1,* 403 B.R. at 262. Accordingly, the Trustee's Short Period claim is logically related to the IRS's request for Short Period penalties, and considerations of judicial economy and fairness support the conclusion that the IRS waived sovereign immun-

ity as to that claim.

Alternatively, I find that the IRS's request for Short Period taxes also provides a basis for Section 106(b) jurisdiction. The IRS does not dispute that this request arises out of the same transaction or occurrence as the Trustee's Short Period refund claim. Rather, the IRS contends **\*32** that because it filed its request for Short Period taxes three days after the Trustee's claim, the Trustee's claim cannot be considered a "counterclaim." However, by the time the Bankruptcy Court actually resolved both parties' claims, the IRS had indisputably waived sovereign immunity in the Bankruptcy Court for all claims logically related to its request for Short Period taxes. That the Trustee filed its claim three days prior does not eliminate this waiver, and I therefore find that the IRS's request for Short Period taxes provided an additional basis for a waiver of sovereign immunity under Section 106(b).[FN8]

> FN8. This conclusion does not apply to the Trustee's refund claim for 1998, as that claim was derived from NOLs entirely distinct from those related to PT–1's Short Period tax liability.

**b. Original claims rejected as untimely**

[19] Next, the IRS contends that it has not waived sovereign immunity because its claims were rejected by the Bankruptcy Court as untimely. However, Section 106(b) does not require a decision on the merits of the claim filed by the Governmental unit for the Government to be deemed to have waived sovereign immunity. Instead, it states that the Government waives such immunity upon the filing of a proof of claim. *See* 11 U.S.C. § 106(b). This is consistent with the fundamental premise of the Bankruptcy Code that once a creditor files a claim against the bankruptcy estate, it triggers the claims process and subjects itself to the bankruptcy court's jurisdiction. *See Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1991). Thus, Section

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

106(b) applies even when claims filed by the IRS are dismissed as untimely.

### c. Application of Section 106(b) to requests for administrative expenses

[20] The IRS next argues that it has not waived sovereign immunity because its claims arose postpetition and are therefore requests for administrative expenses filed pursuant to 11 U.S.C. § 503. Section 106(b), on the other hand, specifically refers to proofs of claim, which are filed by "creditors" pursuant to 11 U.S.C. § 501. Creditor, in turn, is defined in 11 U.S.C. § 101(10) as an entity with a claim that arose prepetition, absent exceptions not relevant here. In light of this clear choice of language by Congress in drafting Section 106(b), I agree with the IRS's contention.

[21] As noted above in the discussion of Section 106(a), the plain meaning of a statute governs unless that statute is ambiguous or would lead to an absurd result. *See Lamie, 540 U.S. at 534, 124 S.Ct. 1023; In re Ames, 582 F.3d at 427.* Further, Congress is presumed to mean what it says. *See BedRoc, 541 U.S. at 183, 124 S.Ct. 1587.* In this case, proof of claim is a well-established term of art under bankruptcy law that is distinguished from an administrative expense. "Proof of claim," through both long, historical usage and statutory language, always refers to a debtor's obligation to a creditor that arose prepetition; "administrative claim" is the term that is used for postpetition obligations. *Compare* 11 U.S.C. § 501 *with* 11 U.S.C. § 503. This distinction is also recognized in the caselaw, as evidenced most recently by the Second Circuit's detailed discussion of the distinction between prepetition proofs of claim and postpetition administrative expenses under the Bankruptcy Code. *See generally In re Ames, 582 F.3d 422.* Accordingly, I find that under the plain meaning of Section 106(b), the Government waives sovereign immunity**33** with regard to prepetition proofs of claim.[FN9]

FN9. The language "files a proof of claim"

was added to Section 106(b) by the Bankruptcy Reform Act of 1994. Both caselaw and commentators have noted that this language was intended to clarify that counterclaims against the Government were only permitted in cases in which the Government actually filed a proof of claim. *See generally AER–Aerotron, Inc. v. Tex. Dept. of Transp., 104 F.3d 677 (4th Cir.1997); see also* 2 Collier on Bankruptcy § 106.LH (16th ed.2009); Katrina A. Kelly, *Comment: In the Aftermath of Seminole: Waiver of Sovereign Immunity under Section 106(b) of the Bankruptcy Code,* 15 Bank. Dev. J. 151, 169 (1999). Nevertheless, if Congress only wanted to solve this confusion and not otherwise clarify the scope of Section 106(b), it could have simply added the word "filed" to that subsection. Instead, it also added "a proof of claim," which language I am compelled to give meaning to for the reasons noted above and below. *See AER–Aerotron, 104 F.3d at 680* (noting that the new Section 106(b) "injects three new related requirements," including proof of claim, which the court recognized is a specifically defined concept).

I also find that this reading of the statute does not lead to an absurd result. As an initial matter, the Government's sovereign immunity for claims asserted against it may still be waived under Section 106(a), which provides a waiver under 60 Bankruptcy Code sections. Thus, my interpretation of Section 106(b) will only limit the ability of a Bankruptcy Court to hear counterclaims that do not fall under those Sections of the Bankruptcy Code. *See* 2 Collier on Bankruptcy § 106.05 (16th ed. 2009) (noting that Section 106(b) is significant because it allows nonbankruptcy law causes of action to be asserted against the Government). Second, the Trustee has not pointed to any evidence or argument that supports the conclusion that Congress could not have intended to distinguish

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

between prepetition and postpetition claims, and the Court is not aware of any. Instead, the Court finds persuasive that in 2005, Congress added a provision to Section 503 that exempts the Government from filing a request for an administrative tax expense in order for its claim to be allowed under that Section. *See* 11 U.S.C. § 503(b)(1)(D). Thus, the Government is now entitled to a priority administrative expense without filing a request, and Section 106(b) need not play any role in administrative tax claims ever again. Accordingly, I find that the IRS's request for administrative expenses in this case did not waive its sovereign immunity under Section 106(b).

**III. Acceptance of the 2001 Stub Period Return**

The IRS's next point of contention is that the Bankruptcy Court lacked jurisdiction to compel it to accept PT–1's standalone 2001 Stub Period tax return. In any event, the IRS contends that the Bankruptcy Court incorrectly held that it acted in an arbitrary or capricious manner in refusing to accept the return. Before addressing the law and facts as to this point, I briefly discuss the Internal Revenue Code provisions and Treasury Regulations regarding consolidated income tax returns, which are at the heart of this dispute.

A default presumption in the Internal Revenue Code is that a tax return will report the tax liability of a single taxpayer. One exception to this presumption is that a group of related businesses may, in certain circumstances, file a single consolidated income tax return that collectively reports the income tax liabilities of all the businesses. *See* 26 U.S.C. § 1501. Such returns are filed in the name of the "common parent," which acts as the agent on behalf of the group's subsidiaries in all matters related to the group's tax liability. *See* 26 C.F.R. § 1.1502–77(a).

**\*34** [22] Once a group files a consolidated return, it must continue to file as a group unless the IRS grants permission for it to deconsolidate. *See* In re Prudential Lines, Inc., 928 F.2d 565, 569 (2d Cir.1991). In the consolidated return, the group computes its liability for all of its members as a whole. Individual members do not calculate NOLs, but instead net any income and losses into a single consolidated net operating loss, known in the regulations as a "CNOL," before taking any CNOL carryover deductions. *See* 26 C.F.R. § 1.1502–21(a); *see also* 26 C.F.R. § 1.1502–21(e) (defining consolidated net operating loss as "excess of deductions over gross income" for the group). If a corporation ceases to be a member of a consolidated group during a given year, "net operating loss carryovers attributable to the corporation are first carried to the consolidated return for that year." 26 C.F.R. § 1.1502–21(b)(2)(ii)(A). A departing member may then claim on its own later-filed returns NOLs allocable to it while it was in the group, but only in "the amount so attributable that is not absorbed by the group in that [last group return] year." *Id.*

The dispute with regard to the 2001 Stub return centers around the Trustee's effort to carry forward to the Short Period PT–1's NOLs properly allocated to it from the Star Group's 2000 return. The IRS has objected on the ground that because Star never filed a return for the Stub Period, it does not know whether any or all of the NOL carryover would be absorbed by profits of other Star entities during that period. The Trustee's response is that the Star Group filed for bankruptcy shortly after PT–1 did, has been liquidated, and neither the Trustee nor any member of PT–1 has access to the Star Group's records. The Trustee therefore has taken the position before the Bankruptcy Court and before this Court that the IRS should have accepted its individual return, and should be compelled to do so.

Both the parties and the Bankruptcy Court have cited Treasury Regulation § 1.1502–77A(d) as governing this issue. That regulation provides:

If the common parent corporation contemplates dissolution, or is about to be dissolved, or if for any

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

other reason its existence is about to terminate, it shall forthwith notify the Commissioner of such fact and designate, subject to the approval of the Commissioner, another member to act as agent in its place to the same extent and subject to the same conditions and limitations as are applicable to the common parent. *If the notice thus required is not given by the common parent, or the designation is not approved by the Commissioner, the remaining members may, subject to the approval of the Commissioner, designate another member to act as such agent, and notice of such designation shall be given to the Commissioner.* Until a notice in writing designating a new agent has been approved by the Commissioner, any notice of deficiency or other communication mailed to the common parent shall be considered as having been properly mailed to the agent of the group; *or, if the Commissioner has reason to believe that the existence of the common parent has terminated, he may, if he deems it advisable, deal directly with any member in respect of its liability.*

26 C.F.R. § 1.1502–77A(d) (emphasis added).

The IRS contends that the Trustee should have sought to represent as agent the entire Star Group and file a Stub return for that period, as the first highlighted portion of the regulation allows. It concedes that this may have been a difficult**35** endeavor, but nonetheless argues that it was the Trustee's responsibility to undertake this task if it wished to carryover the NOLs and obtain a refund. Moreover, the IRS contends that the Bankruptcy Court improperly relied on the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.,* in compelling it to accept the deconsolidated tax return because: 1) that part of the regulation that gives the IRS the authority to treat PT–1 independently (the second portion of the regulation highlighted above) also gives the IRS unreviewable discretion in deciding whether to do so; and 2) the Bankruptcy Court is prohibited from forcing the IRS to accept the return by the Tax Anti–Injunction Act,

26 U.S.C. § 7421. I address these jurisdictional arguments first, and then address the merits of the dispute.

**1) Review under the Administrative Procedures Act**

[23] The Administrative Procedures Act's (the "APA") comprehensive provisions for judicial review of "agency actions" are contained in 5 U.S.C. §§ 701–706. Any person "adversely affected or aggrieved" by agency action, *see id.* at § 702, including a "failure to act," is entitled to "judicial review thereof," as long as the action is a "final agency action for which there is no other adequate remedy in a court," *see id.* at § 704. The standards to be applied on review are set forth in Section 706. But before a party can have judicial review, it must first clear the hurdle of Section 701(a). *See Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *see also Webster v. Doe,* 486 U.S. 592, 599–600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). That Section provides that the chapter on judicial review "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). "These exceptions are construed narrowly and apply only if there is clear and convincing evidence of legislative intention to preclude review." *Conyers v. Rossides,* 558 F.3d 137, 143 (2d Cir.2009). The Government contends that each of these exceptions apply here and independently preclude the Bankruptcy Court's order requiring the IRS to accept the Stub Period return in this case.

**a. Committed to agency discretion by law**

[24][25] The APA embodies a " 'basic presumption of judicial review.' " *Lunney v. United States,* 319 F.3d 550, 558 (2d Cir.2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). However, this presumption is overcome and a reviewing court is without jurisdiction if the statute said to govern the challenged agency action "is drawn so that a court would have

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

no meaningful standard against which to judge the agency's exercise of discretion." *Heckler,* 470 U.S. at 830, 105 S.Ct. 1649. Thus "§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based," *Webster,* 486 U.S. at 600, 108 S.Ct. 2047, and requires dismissal when there is "no law to apply," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

    The law highlighted by the Trustee and discussed by the Bankruptcy Court is the Treasury Regulation quoted above. This provision states that "if the Commissioner has reason to believe that the existence of the common parent has terminated, he may, if he deems it advisable, deal directly with any member in respect of its liability." 26 C.F.R. § 1.1502–77A(d). Notably absent from this regulation is any mention about how the Commissioner should reach **\*36** this determination or what he should consider. It therefore appears at first blush that the IRS has the better argument here, and its determination not to consider PT–1's Stub Period tax return is a non-reviewable exercise of agency discretion.

    This argument is further supported by several cases cited by the IRS that have held agency action to be unreviewable since the Supreme Court's decision in *Heckler.* For example, in *Webster,* the Supreme Court held that the Section 102(c) of the National Security Act provided the Director of the NSA unreviewable discretion to terminate an employee when it stated merely that the Director can terminate the employee whenever he "shall deem such termination necessary or advisable in the interests of the United States." 486 U.S. at 600, 108 S.Ct. 2047. Although the Supreme Court based this decision in part on the structure and nature of the NSA, it first and foremost relied on the fact that the statute shows deference to the Director and does not state that termination is appropriate when the dismissal "is" necessary, but rather when "the Director deems it necessary." *See id.* Other decisions cited by the IRS have reached the

same result based on similarly deferential statutes. *See Conyers,* 558 F.3d at 144–46 (holding that Section 111(d) under the Aviation and Transportation Security Act, which empowers the Administrator of the FAA to employ and fix the terms and conditions of employment for such number of "screeners" as he deems to be necessary, provides unreviewable discretion to the Administrator); *Schneider v. Feinberg,* 345 F.3d 135, 149 (2d Cir.2003) (no jurisdiction to review special master's calculation of payouts from 9/11 victim compensation fund because Sections 404 and 405 of Air Transportation and Safety and System Stabilization Act of 2001 expressly allowed Attorney General and Special Master to adopt all regulations necessary to resolve claims).

    [26] Based on this precedent, I agree with the IRS that Treasury Regulation § 1.1502–77A(d) is drawn so broadly as to give absolute judgment to the Commissioner of the IRS as to whether to accept a deconsolidated return from a taxpayer in PT–1's position. Nevertheless, I do not agree that this necessarily removes the IRS's determination from judicial review. As noted by the Trustee, the Treasury Regulation relied on by the IRS is just that, a regulation enacted by the Secretary of the Treasury. I find this fact to be fatal to the IRS's position for two interrelated reasons.

    First, the Supreme Court's decision in *Heckler* describes the agency discretion exception to judicial review as applying to Congressional statutes drawn so broadly that they "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Heckler, 470 U.S. at 830, 105 S.Ct. 1649.* Thus, the Supreme Court was clearly concerned with Congressional intent, albeit in a less direct fashion than Congress was when in enacted Section 701(a)(1) of the APA. *See id.* However, in this case, Congress has not given the IRS unreviewable discretion in determining whether to accept deconsolidated tax returns—the IRS has given itself that discretion. This raises the serious question of whether an

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

agency can insulate its decisions from judicial review by its own regulations. In light of the "strong presumption that Congress intends judicial review of administrative actions," *Conyers*, 558 F.3d at 143 (internal quotation marks omitted), and the fact that the Supreme Court in *Heckler* considered this presumption to be rebutted only when a congressional statute was drawn so broadly as to suggest Congressional intent to give absolute discretion to an agency, I conclude **\*37** that Section 1.1502–77A(d) cannot give this absolute discretion to the IRS.

Second, there is a Congressional statute that provides the law to which the arbitrary and capricious standard set forth in Section 706 of the APA can be applied. Section 1.102–77A(d) was enacted by the IRS pursuant to 26 U.S.C. § 1502, which provides as follows:

> The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

In this statute, Congress did not give blanket discretion to the IRS, but rather directed that the Commissioner had to adopt regulations as he deems necessary to insure that the tax liability of an affiliated group of corporations may be determined in a matter that clearly reflects the income tax liability and prevents avoidance of such liability. In other words, the Commissioner's assigned function under Section 1502 is to accurately assess the tax liability of affiliated corporations and prevent corporations from avoiding such liability. I therefore conclude that this is not "one of those rare instances where statutes are

drawn in such broad terms that in a given case there is no law to apply." *See Volpe*, 401 U.S. at 410, 91 S.Ct. 814; *see also Christianson v. Hauptman*, 991 F.2d 59, 62–63 (2d Cir.1993) (looking to the purpose of related statutes in concluding that Congress "sought to limit the scope of the Service's authority"); *M & T Mortg. Corp. v. White*, No. 04–CV–4775, 2006 WL 47467, at \*10, 2006 U.S. Dist. LEXIS 1903, at \*33 (E.D.N.Y. Jan. 9, 2006) (holding that the "affirmatively to further the policies of this title" provision of 42 U.S.C. § 3608(e)(5) provided a sufficient standard by which to review the Department of Housing and Urban Development's conduct).

### b. Tax Anti–Injunction Act

[27][28] In the alternative, the IRS contends that there is no jurisdiction under § 701(a)(1) of the APA because the Tax Anti–Injunction Act prohibited the Bankruptcy Court from requiring the IRS to accept a deconsolidated return for the Stub Period. The Tax Anti–Injunction Act provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The purpose of this statute is to protect the Government's need "to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); *Randell v. United States*, 64 F.3d 101, 106 (2d Cir.1995).

The Bankruptcy Court held that the Anti–Injunction Act does not apply here because directing the IRS to accept PT–1's tax return for the Stub Period does not impact the Government's ability to collect taxes. I agree. Both the language of the statute and the caselaw interpreting it are clear that the Act governs proceedings in which a party is attempting to prevent the IRS from collecting a tax. This includes the Second Circuit's decision in *S.E.C. v. Credit Ban-*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

*corp, Ltd.,* 297 F.3d 127 (2d Cir.2002), on which the IRS relies for the **\*38** proposition that the Second Circuit has emphasized substance over form when interpreting the Act. Even in *Credit Bancorp,* the IRS was attempting to collect a tax and the debtor was attempting to prevent it from doing so by obtaining an order establishing that other claims had priority over the IRS's tax claim. *See id.* at 137–38. In this case, on the other hand, the Trustee sought a refund, which is exactly what the Tax Anti–Injunction Act requires. To accomplish this, it simply sought an order compelling the IRS to accept its deconsolidated tax return for the Stub Period. The IRS was free to disagree with the Trustee's reporting, and it was free to argue that it had not acted arbitrarily or capriciously in denying PT–1's request to file on its own. This does not amount to a suit that restrains the assessment or collection of any tax.

The IRS's principal counterargument is that it does not know what a consolidated return from the Star Group would look like, and for that reason the order requiring it to accept the Stub return very well may have prevented it from offsetting any loss claimed by PT–1 with Star Group profits from that period. However, as I discuss in greater detail below, the IRS has no factual basis for this assertion. Instead, the IRS simply believes that it is the Trustee's obligation to represent the Star Group as a whole and to first investigate Star's finances before the IRS must make a determination. But that is not required by the Tax Anti–Injunction Act. Accordingly, I conclude, as the Bankruptcy Court did, that the Tax Anti–Injunction Act did not prohibit the Bankruptcy Court from compelling the IRS to accept the deconsolidated Stub Period return.

### c. Arbitrary and capricious agency action

[29] In Decision III, the Bankruptcy Court held that the IRS acted in an arbitrary and capricious manner in refusing to accept PT–1's deconsolidated Stub return. The court concluded that the IRS's argument that there was a "possibility" that other members of

the Star Group owed additional tax "appears to be makeweight," and that it "is inescapable that the IRS's refusal to deal directly with the PT–1 Group, and its refusal to accept the PT–1 Group's stand-alone tax return for the Stub Period, is arbitrary and capricious." In support, the Bankruptcy Court cited the following facts: 1) the IRS withdrew its claim against the Star Group for Stub Period taxes in the Star Group bankruptcy; 2) the Trustee's counsel stated without contradiction or objection from the IRS that he had conversations with two members of the IRS district counsel who stated that STAR did not have any tax liability during the Stub Period; 3) the Star Group has since been liquidated pursuant to its plan of reorganization; 4) the IRS accepted PT–1's postpetition deconsolidated tax returns, while at the same time stating that it did not have a view as to when, if ever, PT–1 ceased being a member of the Star Group; and 5) the IRS did not dispute that PT–1 was not in a position to be designated as agent for the Star Group or to file a return on its behalf.

None of these factual findings are disputed by the IRS, and none are clearly erroneous.[FN10] I therefore accept them as true. Considering these findings, in addition to the fact that the Star Group lost millions of dollars in 2000 (some of which was allocable to PT–1) and filed for bankruptcy**\*39** in 2001, and that the Stub Period only covered January and February of 2001, there is substantial evidence to support the conclusion that the remaining Star entities lost money during the Stub Period. The IRS responds that it simply does not bear the burden of determining whether the Star Group had profits, but I do not accept that when faced with the evidence noted above, the IRS can refuse to accept a deconsolidated return because of the remote possibility that some or all of PT–1's losses would be absorbed by the Star Group. Moreover, even PT–1 had the burden of making such a demonstration, the undisputed facts set forth above are certainly sufficient to constitute a *prima facie* case that the Star Group had no profits during this period, and it the IRS offered nothing in rebuttal. The

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

IRS's refusal to accept a standalone return cannot be said to serve the purpose of accurately assessing PT–1's tax liability or preventing the avoidance of such liability. *See* 26 U.S.C. § 1502. I therefore agree with the Bankruptcy Court that the IRS acted in an arbitrary and capricious manner in refusing to accept PT–1's deconsolidated tax return. [FN11]

> FN10. The IRS has noted on appeal that the Trustee could have subpoenaed the Star Group's accountants, but at the same time it has also acknowledged the difficulty the Trustee would have in compiling the finances of the Star Group, in which PT–1 was only a small part.

> FN11. Although the Bankruptcy Court did not rely on Section 1502 in reaching its conclusion, it is clear from its analysis that its decision was motivated by the accurate assessment of PT–1's tax liability.

**IV. Evaluation of the Pre–Paid Business's Sale to IDT**

With the IRS having been compelled to the accept the Stub Period return, PT–1's tax treatment of the sale of its pre-paid phone card business to IDT in February 2001 became critical to the Trustee's entitlement to a refund for the Short Period. Based on the testimony of Rosalind Gaffney and PT–1's general ledger, which were introduced into evidence during a three day hearing in July and August 2009, the Bankruptcy Court held in Decision IV that PT–1 had transferred in the sale its account receivables and inventory (worth approximately $22 million), as well as the obligation to service calls placed under outstanding calling cards. In return, PT–1 received $1 in consideration from IDT, but also recognized $27 million in deferred revenue that had not been deemed income because PT–1 had not yet serviced the calls for which the $27 million was paid. In other words, although PT–1 received only $1 in the sale, it kept the revenue for certain outstanding calling cards. IDT, on the oth-

er hand, assumed the obligation of servicing those outstanding cards, and obtained the right to accounts receivable and inventory. According to Gaffney and the general ledger, PT–1 therefore incurred a net gain of approximately $6 million in this deal. However, after deducting approximately $12 million in uncollectible bad debts, PT–1 suffered a net loss of almost $6 million for the Stub Period.

The IRS accepts on appeal each of these calculations except for the purported $1 price for the pre-paid business. In support, it relies solely on the sale agreement between PT–1 and IDT, an adversary complaint filed by PT–1 against IDT in its own bankruptcy proceeding, and a settlement agreement between PT–1 and IDT for approximately $14 million. However, these documents were not offered into evidence at trial, despite the fact that the sale and the adversary proceeding between PT–1 and IDT was known to the IRS at that time, as evidenced by the colloquy between the IRS's counsel and the Bankruptcy Court during the hearing. *See In re PT–1, 447 B.R. at 133–34.* Instead, the IRS moved to reopen the evidentiary record so that the Bankruptcy Court could take judicial notice of these documents over one **\*40** year after the evidentiary hearing had concluded, and over four months after oral argument was complete and the record was closed.

As best can be determined from Decision IV, the Bankruptcy Court denied this motion. The IRS therefore contends on appeal that this was an abuse of discretion. Additionally, the IRS contends that once these documents are considered part of the record, the Bankruptcy Court's conclusion that PT–1 sold the business for $1 is clearly erroneous.

[30][31] An application to reopen the record is committed to the sound discretion of the trial judge. *See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331–32, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Matthew Bender & Co., Inc. v. West Publ'g Co., 158 F.3d 674, 679 (2d Cir.1998); Romeo v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

*Sherry,* 308 F.Supp.2d 128, 138–39 (S.D.N.Y.2004). Although the Second Circuit has not articulated a test for evaluating the exercise of this discretion, it has noted that "[o]nly reasonable genuine surprise on the part of the appellant combined with an assertion of the nature of the additional evidence would give us sufficient reason to remand for the taking of additional evidence." *Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 495 (2d Cir.1985). Further, the Circuit has cited positively to the Fifth Circuit's decision in *Garcia v. Woman's Hosp.,* 97 F.3d 810 (5th Cir.1996), in which that court considered: 1) the importance and probative value of the evidence; 2) the reason for the moving party's failure to introduce the evidence earlier; and 3) the possibility of prejudice to the non-moving party." *Id. at 814.* I will therefore apply this standard here.

[32] Beginning first with the probative value of the evidence, the question of PT–1's tax liability begins with its classification as a taxpayer. PT–1 reported income on an accrual basis, which means that it was required to report income when: 1) all the events have occurred which fix the right to receive the income; and 2) the amount of the income could be determined with reasonable accuracy. *See* 26 C.F.R. § 1.446–1(c)(1)(ii)(A). Under the terms of the contract, IDT was required to place $4 million in escrow, which was to be paid to PT–1 upon closing of the sale as a deposit for future "termination services" that PT–1 was to perform for IDT.

Although neither party has offered any authority or analysis regarding how this Court should interpret this fact,[FN12] the terms of the agreement appear to place this case on all fours with *Schlude v. Comm'r of Internal Revenue,* 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963). In *Schlude,* the Supreme Court upheld the Commissioner's determination that contract installments that were a prepayment for future services should be included in gross income in the tax year they became due and payable, whether or not they were actually paid. *See id. at 134, 136–37, 83*

S.Ct. 601 ("For an accrual basis taxpayer, it is the *right* to receive and not the actual receipt that determines the inclusion in the amount in gross income." (internal quotation marks omitted) (emphasis in original)). Here, the sale agreement calls for that payment to made during the Stub Period. Thus, under *Schlude,* the $4 million payment should have been recorded as income during the Stub Period. [FN13]

> FN12. The IRS simply states that it must be recognized during the Stub Period, while the Trustee emphasizes that the payment was for future services and was never received.

> FN13. The IRS also offers the blanket assertion that some portion of the 2004 settlement must be booked as income during the Stub Period, but I do not accept this contention. The IRS offers no legal support for the conclusion that a portion of the 2004 settlement, which notably was a global resolution of all claims in the adversary complaint, in fact accrued in the 2001 Stub Period under principles of tax accounting. It further has offered no evidence as to what amount of the settlement is properly booked in the Stub Period. I therefore agree with the Bankruptcy Court that the adversary complaint and the settlement agreement are not probative on this issue.

*41 However, as noted above, the probative value of the evidence is but one factor in the analysis, and the remaining factors are fatal to the IRS's position. Most importantly, the IRS has utterly failed to justify its failure to introduce these documents during the evidentiary hearing. The IRS contends on appeal that it neglected to do so because the Trustee first construed the sale as a loss in its second post-trial brief filed in May 2010 (the IRS filed its motion to reopen two months later). However, I cannot accept that the IRS was unaware of the Trustee's position on the proper tax treatment of the sale until that late in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

these proceedings. As the Bankruptcy Court found, and as is confirmed by the transcript of the evidentiary hearing, Gaffney unequivocally testified that PT–1 reported a $5.8 million taxable gain on the sale by subtracting the accounts receivable sold to IDT from the deferred revenue PT–1 retained and realized. In other words, because PT–1 had approximately $27 million in deferred revenue, the sale, when distinguished from the realization of this deferred revenue as income, clearly was represented as a loss. This arithmetic is also unambiguously expressed in the Trustee's first brief, filed shortly after the evidentiary hearing and before oral argument. Thus, the Trustee's treatment of the sale was clear. Moreover, the amount PT–1 received from IDT in consideration would always have been relevant to PT–1's tax liability, and the IRS offers no explanation for why it would not have contested the allegedly inaccurate $1 sale price in any event. The IRS has therefore failed to offer any justification for its failure to offer these documents into evidence during the hearing, and this factor precludes me from concluding that the Bankruptcy Court abused its discretion in refusing to reopen the record.

Finally, as to prejudice, the Trustee does not specifically address this prong on appeal, but argued to the Bankruptcy Court that he would be prejudiced by not being able to "examine the drafters of the documents or examine the former officers and directors of PT–1 who were involved in the litigation." Although those involved in the litigation would not be relevant as I have already discounted the probative value of the settlement documents, the Trustee is correct that he faces at least some degree of disadvantage by being surprised with this document over a year after the evidentiary hearing closed and by not having the opportunity to submit evidence with regard to the terms of the contract, which is undoubtedly complex.

In sum, the IRS was well aware at the time of the evidentiary hearing that the Trustee was relying on the $1 sale price in calculating the tax owed for the

Stub Period. Further, it should have been clear that the Trustee was including the deferred revenue in determining that the net effect of the sale was an approximately $6 million gain, and that when this gain was combined with a deduction for bad debts, the result was an approximately $6 million loss. Nevertheless, the IRS neglected to raise any issue or assert any argument with regard to other consideration PT–1 may have received as a result of the sale at that time. Rather, it awoke to these issues over a year after the evidentiary hearing, and over four months after oral argument on the evidence had concluded. This extreme example of both delay and a **\*42** lack of justification establishes that the Bankruptcy Court did not abuse its discretion in denying the IRS's motion to reopen the record. Accordingly, these documents are not a part of the record before me, and without them, the Bankruptcy Court's factual findings regarding the sale are not clearly erroneous.

**V. Remaining Contentions Regarding Tax Liability**

The parties challenge four additional rulings of the Bankruptcy Court with regard to the Trustee's tax liability for the relevant periods. They are: 1) the allowance of certain bad-debt deductions for the Stub Period, the Short Period, and the 2002 tax year; 2) the disallowance of a bad-debt deduction for the 2003 tax year; 3) the discharging of the Trustee from any liability for the 2002 tax year as a result of the IRS's failure to comply with the timing requirements of 11 U.S.C. § 505(b); and 4) the barring of claims filed by the IRS for the 2001 Short Period due to the IRS's failure to meet the administrative bar date. I find these challenges to be without merit, and affirm the decision of the Bankruptcy Court as to these issues based on that Court's well-reasoned analysis.

**VI. Recoupment and Setoff**

[33] Having concluded that the Bankruptcy Court correctly calculated the Trustee's tax overpayments in this case, the final dispute at issue in this appeal is whether the Bankruptcy Court had jurisdic-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

tion to enjoin the IRS from the future exercise of any right to setoff or recoupment against the Trustee. "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (internal quotation marks omitted). Setoff is a longstanding common law defense that provides a defendant with the right not to part with one's funds. *See id.* at 21, 116 S.Ct. 286; *In re Chateaugay Corp.,* 94 F.3d 772, 777–79 (2d Cir.1996). It is also granted to the Federal Government by several statutes, including 26 U.S.C. § 6402, which provides that when a taxpayer has made an overpayment, the Secretary of the Treasury may, within the "applicable period of limitations," credit that overpayment against any tax "liability" owed to the IRS by that taxpayer. *See* 26 U.S.C. § 6402(a).

[34][35] Recoupment, on the other hand, involves a special subset of setoff that applies in cases in which the factual basis for the claim and the setoff defense are related. *See Reiter v. Cooper,* 507 U.S. 258, 264, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). The benefit of recoupment over setoff is that recoupment rights survive even if the defending party could not bring an affirmative claim due to the expiration of the applicable statute of limitations. This is true, however, only if the original suit, to which the recoupment is lodged as a defense, is timely. *See id.; Davidovich v. Welton (In re Davidovich),* 901 F.2d 1533, 1537 (10th Cir.1990).

[36] The Bankruptcy Court held that because the IRS failed to object to the provision of the plan barring the exercise of setoff and recoupment rights prior to confirmation, it is barred from objecting after the fact according to principles *of res judicata.* The Court further noted that the IRS was of the position that it was "somehow exempt" from this plan provision, but that it had failed to cite any authority for its argument. *See In re PT–1,* 447 B.R. at 133–34. How-

ever, the authority is the now familiar ground of sovereign immunity. As previously discussed, the sovereign immunity of the United **\*43** States may only be waived by statute, *see Presidential Gardens,* 175 F.3d at 139, and must be "unequivocally expressed." *Diaz v. United States,* 517 F.3d 608, 611 (2d Cir.2008); *see also United States v. U.S. Fid. & Guar. Co.,* 309 U.S. 506, 513–14, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (holding that sovereign immunity may not be waived by the inadvertence of government officials, and there is no *res judicata* when jurisdiction is based on such a waiver). Sovereign immunity protects the right to setoff and recoupment, *see Malman v. United States,* 207 F.2d 897, 898 (2d Cir.1953) (requiring sovereign immunity waiver to include setoff rights, and noting general policy under predecessor to 31 U.S.C. § 3728 that "claims against the United States are always subject to set-off"), and setoff similarly may only be abrogated if "there is some explicit statutory or contractual provision that bars its exercise." *Applied Cos. v. United States,* 144 F.3d 1470, 1476 (Fed.Cir.1998). The question, therefore, is under what statute has the IRS waived sovereign immunity such that it can be enjoined from exercising its rights to setoff and recoupment?

Neither the Bankruptcy Court nor the Trustee has cited any. The IRS has volunteered 11 U.S.C. § 1141(a), but unsurprisingly promptly distinguishes that statute from the instant action. Section 1141 is one of the provisions for which sovereign immunity is waived under 11 U.S.C. § 106(a), and subsection (a) of that statute provides that certain parties are bound by the provisions of a confirmed plan. However, the only potentially applicable class of parties set forth in subsection (a) that the IRS could fit in is that of a creditor. As discussed above, a creditor is defined in 11 U.S.C. § 101(10) as a holder of a prepetition claim. Accordingly, Section 1141 does not provide the explicit waiver of sovereign immunity that the Trustee needs.

The Trustee nevertheless contends, as the Bank-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPA-37

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

ruptcy Court did, that caselaw establishes the *res judicata* effect of confirmed plans. However, the majority of these cases do not involve the Government as a party, and therefore are not instructive on the issue of sovereign immunity. *See, e.g., Silverman v. Tracar, S.A. (In re Am. Preferred Prescription),* 255 F.3d 87, 92 (2d Cir.2001); *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.,* No. 02 Civ. 9629, 2003 WL 21355214, 2003 U.S. Dist. LEXIS 9802 (S.D.N.Y. June 11, 2003). For those cases that do involve the Government, one is distinguishable on its facts, and the second offers only dicta.

Beginning first with the latter of these two cases, both the Bankruptcy Court and the Trustee have relied on *In re Bousa Inc.,* No. 89–B–13380, 2006 WL 2864964, 2006 Bankr.LEXIS 2733 (Bankr.S.D.N.Y. Sep. 29, 2006), for its holding that because the plan did not expressly prohibit the future exercise of rights to setoff or recoupment, the Government could not be barred from asserting these rights. *See id.* at *6–7, 2006 Bankr.LEXIS 2733, at *21–22. However, it would not be proper for me to draw from this holding that the *Bousa* court would have enjoined the Government's rights had the plan so provided. The court was not faced with those facts, did not enjoin the Government's right to setoff or recoupment, and did not discuss sovereign immunity. I therefore find that decision to be of limited value here.

Second, the Trustee cites to *United States v. Cont'l Airlines (In re Cont'l Airlines),* 134 F.3d 536 (3d Cir.1998), in which the Third Circuit held that the Government was bound by a confirmed plan. However, this case is distinguishable on its facts. First, the *Continental* decision made no mention of sovereign immunity, and it therefore does not appear to have **\*44** been raised as a defense by the Government. Second, the Government was a prepetition creditor in that case, and therefore had waived sovereign immunity under Section 1141(a). Third, a district court had held the Government liable for the sum it wished to setoff approximately eight months prior to plan

confirmation, yet the Government failed to assert its right to setoff in the bankruptcy in the interim. *See id.* at 537–38. Here, by contrast, no claim was asserted against the IRS until after plan confirmation. Accordingly, I find that these decisions do not support the conclusions that the Bankruptcy Court had jurisdiction to enjoin the IRS's rights to setoff and recoupment in the plan as a result of the IRS's failure to object.

[37] That is not to say, however, that the IRS is free to exercise its rights to setoff or recoupment against each of the potential liabilities of the Trustee it identifies in its papers. Specifically, the IRS notes that it will seek approximately $140,000 in unpaid taxes that the Trustee allegedly owes from 2002, notwithstanding the fact that the Bankruptcy Court, and now this Court, has held that the Trustee was discharged from this liability pursuant to the procedures set forth in 11 U.S.C. § 505(b)(2). The Trustee argued below that there is no right to setoff as a result of this discharge, which argument the Bankruptcy Court elected not to address in light of its conclusion that *res judicata* was sufficient to expunge the IRS's rights. Because I do not agree with the Bankruptcy Court on this issue, I address the implication of Section 505(b) with regard to the IRS's setoff rights here.

Section 505(b)(2) provides that when a request for a determination of unpaid tax liability incurred during the administration of the case is submitted to the IRS and the Government does not provide notification of any tax due within 180 days, the estate, the trustee, the debtor, and any successor to the debtor are discharged from any liability for such tax. *See* 11 U.S.C. § 505(b)(2). Notwithstanding this discharge from liability, the IRS contends that its defensive right of setoff remains viable, as the Trustee's liability must be distinguished from the IRS's affirmative defenses. In support of this argument, the IRS relies on the "vast majority of courts" to conclude that a defendant's right to setoff is unaffected by discharge. The IRS is correct that the majority of courts have

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

reached this conclusion, *see Luongo,* 259 F.3d at 333 (citing cases), but those decisions all address setoff under 11 U.S.C. § 553, which is explicitly limited to the setoff of prepetition claims, *see id.* Moreover, the IRS has not identified a single case, and this Court has found none, that has held the right of setoff to survive a discharge of liability based on the narrow interpretation of that term advocated by the IRS. Instead, those decisions primarily rely on that portion of Section 553 that states "this title does not affect any right of a creditor to offset a mutual debt," which courts have interpreted to mean that no provision of the Bankruptcy Code abrogates a right to setoff mutual prepetition obligations. *See Luongo,* 259 F.3d at 333; *Davidovich,* 901 F.2d at 1539; *see also Carolco Television Inc. v. Nat'l Broad. Co., (In re De Laurentiis Entertainment Group, Inc.),* 963 F.2d 1269, 1276 (9th Cir.1992) (relying on the language of Section 553 in addition to various policy and historical considerations). Thus, the breadth of cases holding that the setoff of prepetition debts trumps the discharge provisions found in other sections of the Bankruptcy Code are not particularly helpful to the IRS's position.

Moreover, the problem with the IRS's restrictive interpretation of the term "liability" is highlighted when one considers **\*45** both the natural meaning of that term and its use in the relevant statutes. As noted above, when the IRS fails to assess additional tax beyond that paid pursuant to a tax return filed along with a request for determination of any unpaid liability, the estate and others are "discharged from any liability from such [unpaid] tax." *See* 11 U.S.C. § 505(b)(2). This discharge of liability, as the IRS would have it, means only that the IRS cannot affirmatively seek recovery from that taxpayer. Its right to setoff, according to the IRS, is untouched. However, the IRS's statutory right to setoff is set forth in Section 6402(a) of the Internal Revenue Code, which states that the Secretary of the Treasury may credit the amount of a tax overpayment "against any liability" of the taxpayer. The Sections use the exact same

term—liability. Thus, when a party is liable to the IRS for taxes owed, the IRS may exercise setoff. However, when the IRS fails to assess tax with the 180–day time limit set forth in Section 505(b)(2) of the Bankruptcy, there is no liability, as it has been discharged.

This is also consistent with the natural meaning of the term liability, and therefore applies equally to any common law right to setoff possessed by the IRS. Liability is defined by Black's Law Dictionary as "[t]he quality or state of being legally obligated or accountable ... a financial or pecuniary obligation ... or a debt." Liability is therefore the equivalent of owing another, which is the term used by the Supreme Court when defining the right to setoff. *See Strumpf,* 516 U.S. at 18, 116 S.Ct. 286 (explaining the setoff allows entities to net monies they "owe each other"). However, when the IRS failed to comply with the procedure set forth in Section 505(b)(2) for the 2002 tax year, PT–1 no longer owed it anything by way of additional taxes. When one is no longer liable to another, it is only natural to conclude that he does not owe that party anything either. And without anything owed to it, the IRS has nothing to setoff against the refund it owes to the Trustee. I therefore conclude that the IRS has no right to setoff for the 2002 tax period. [FN14]

> FN14. In the alternative, the Trustee argued before the Bankruptcy Court, and again here, that the IRS may not assert a right to taxes for 2002 because that right has expired with the statute of limitations. Specifically, 26 U.S.C. § 6402 provides that the IRS has the right to offset an overpayment with a tax liability "within the applicable period of limitations." *See* 26 U.S.C. § 6402(a). The IRS responds that this restriction does not apply to its right to recoupment, which is correct. *See Reiter,* 507 U.S. at 264, 113 S.Ct. 1213. However, the IRS has not asserted a right to recoupment for the 2002 tax year, and re-

486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567
**(Cite as: 486 B.R. 9)**

garding its right to setoff, it simply notes that it has either timely assessed or timely claimed in the Bankruptcy Court all taxes owed. I do not agree, as I conclude that the timing requirement set forth in Section 505(b) of the Bankruptcy Code qualifies as an applicable period of limitations under Section 6402 of the Internal Revenue Code. Thus, this also eliminates any right to setoff for the 2002 tax year.

### CONCLUSION

For the foregoing reasons, the final order of the Bankruptcy Court is hereby affirmed in part and reversed in part. That part of the order enjoining the IRS from exercising any future right to setoff or recoupment is vacated.

**SO ORDERED.**

E.D.N.Y.,2012.
U.S. v. Bond
486 B.R. 9, 110 A.F.T.R.2d 2012-5969, 2012-2 USTC P 50,567

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPA-40

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ SEP 1 8 2012 ★

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

UNITED STATES OF AMERICA,

             Plaintiff/Appellant/Cross-Appellee,

           -against-

EDWARD P. BOND, Liquidating Trustee of
the LIQUIDATIONS TRUST FOR PT-1
COMMUNICATIONS, INC., PT-1 LONG
DISTANCE, INC. AND PT-1
TECHNOLOGIES, INC.,

             Defendant/Appellee/Cross-Appellant.

------------------------------------------------------------------------X

**BROOKLYN OFFICE**

JUDGMENT
11-CV- 5608 (BMC)

       A Corrected Memorandum Decision and Order of Honorable Brian M. Cogan,

United States District Judge, having been filed on September 17, 2012, affirming in part and

reversing in part the final order of the of the Bankruptcy Court; and vacating that part of the

Order enjoining the Internal Revenue Service from exercising any future right to setoff or

recoupment; it is

            ORDERED and ADJUDGED that the final order of the Bankruptcy Court is

hereby vacated to the extent that it enjoined the Internal Revenue Service from exercising any

future right to setoff or recoupment and is otherwise affirmed.

Dated: Brooklyn, New York
       September 17, 2012

                            Douglas C. Palmer
                            Clerk of Court

                            s/Michele Gapinski
           by:   ——————————————————
                            Michele Gapinski
                            Chief Deputy for
                            Court Operations